**DUANE MORRIS LLP**
Matthew A. Taylor (62098)
Bryan N. Shapiro (329241)
30 South 17th Street
Philadelphia, PA 19103-4196
T: (215) 979-1000
e:      MATaylor@duanemorris.com
         BShapiro@duanemorris.com

*Attorneys for Plaintiffs Dynamic Healthcare Services, Inc.*
*and Hometown Oxygen, Pittsburgh LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DYNAMIC HEALTHCARE SERVICES, INC., and HOMETOWN OXYGEN, PITTSBURGH LLC,** | Case No. _____ |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| **DE LAGE LANDEN FINANCIAL SERVICES, INC., PHILIPS RS NORTH AMERICA, LLC f/k/a RESPIRONICS, INC. and PHILIPS MEDICAL CAPITAL, LLC,** | |
| Defendants. | |

**COMPLAINT**

Plaintiffs, Dynamic Healthcare Services, Inc. ("DHS") and Hometown Oxygen,

Pittsburgh LLC ("HOP"), by and through their counsel, Duane Morris LLP, hereby file this

Complaint against Defendants Philips RS North America, LLC f/k/a Respironics, Inc.

("Respironics"), De Lage Landen Financial Services, Inc. ("DLL") and Philips Medical Capital,

LLC ("PMC") (collectively, the "Defendants"), and aver as follows:

## I.    INTRODUCTION

1.      Tens of millions of Americans live with obstructive sleep apnea ("OSA"), a serious health condition involving snoring and interrupted breathing during sleep. Untreated, OSA can have serious health implications, including increased risk of cardiovascular disease, stroke, metabolic disease, excessive daytime sleepiness, work-place errors, traffic accidents, and death.

2.      The first-line treatment for OSA is a continuous positive airway pressure (CPAP) device. A CPAP is a respiratory device that pressurizes air and delivers it through a hose and mask into the airway during sleep. The steady flow of air keeps the airway open, improving respiration and sleep quality.

3.      Research shows that CPAP therapy may improve cardiovascular health, lower stroke risk, lower daytime sleepiness, and improve the mental health of people with OSA.

4.      In the United States, CPAP devices cost between $650 and $1,000 on average[1] for OSA patients without insurance. Many OSA patients use insurance to pay for some or all of the cost of a CPAP device.

5.      Plaintiffs DHS and HOP are respiratory device suppliers. OSA patients, their insurers, or a combination thereof, pay companies like DHS and HOP to help OSA patients select and purchase the correct CPAP device, develop the right treatment program, educate OSA patients on the treatment program, and monitor the patient's progress. Respiratory device suppliers like DHS and HOP also help OSA patients achieve an improved health outcome from their respiratory device therapy by developing clinical programs, educating and monitoring patients, and supplying safe and effective respiratory devices.

---

[1] *See* https://www.ncoa.org/adviser/sleep/cpap-machine-cost/ (last accessed July 15, 2024)

6.      Defendant Respironics and non-party ResMed Inc. ("ResMed") are respiratory device manufacturers. Until a series of FDA recalls of respiratory devices manufactured by Respironics, Respironics was the dominant manufacturer of respiratory devices in the U.S., with a market share of approximately 30%. Today, ResMed is the lead manufacturer of respiratory devices in the U.S. with a market share of approximately 62%.

7.      DHS, HOP, and similar suppliers ("Respiratory Device Suppliers") purchase respiratory devices from Respironics, ResMed, and similar manufacturers ("Respiratory Device Manufacturers") and supply them to end-user patients who have a prescription.

8.      Given the high cost associated with CPAP devices, Respiratory Device Suppliers often require financing to purchase the necessary inventory of respiratory devices to provide to OSA patients ("Respiratory Device Financing").

9.      DLL is the leading financier of respiratory devices in the U.S., holding an approximate 30% market share.

10.      PMC is a joint venture between DLL and Respironics' parent company, Philips North America LLC f/k/a Philips Electronics North America Corporation ("Philips"), and is the exclusive financier of respiratory devices manufactured by Respironics in the U.S.

11.      Prior to the Respironics recall, DHS purchased thousands of respiratory devices and related equipment from Respironics. DHS financed those purchases through PMC. After the recall, DHS had an inventory of unsafe, recalled respiratory devices that it could not supply to OSA patients. Unable to monetize its inventory of unsafe Respironics respiratory devices, DHS was unable to make payments to PMC under the financing arrangements for the Recalled Devices.

12.     Similarly, prior to the Respironics recall, HOP purchased thousands of respiratory devices and related equipment from ResMed. HOP financed those purchases through DLL. However, since no ResMed respiratory devices were involved in the Respironics recall, HOP has continued to sell ResMed respiratory devices and satisfy its financial obligations to DLL.

13.     In August 2022, following Respironics' major recall announcement, PMC declared DHS in default in relation to the Respironics agreements. Respironics and PMC then shared this confidential, commercial information with DLL. Without any justification, DLL then informed ResMed and HOP that it would no longer do business with HOP until DHS paid PMC for the recalled respiratory devices DHS had purchased from Respironics.

14.     Defendants are engaged in an ongoing conspiracy, in violation of Section 1 of the Sherman Act, to cut off access to financing and leasing programs necessary for Respiratory Device Suppliers in the U.S. to compete. DLL and PMC are the dominant providers of financing and leasing programs to Respiratory Device Suppliers in the U.S. DLL and PMC used their affiliation, market power and exclusivity agreements with Respiratory Device Manufacturers to offer zero percent (0%) interest financing. Defendants then shared commercially sensitive information about their customers as part of an anticompetitive scheme to foreclose competition from other lenders and Respiratory Device Manufacturers and raise prices for patients in the U.S.

15.     Defendants' anticompetitive scheme is not meaningfully different from a traditional refusal to deal. Defendants' conduct is facially anticompetitive because it produces clear anticompetitive harm and offers no procompetitive benefits and is a naked concerted refusal to deal with a customer that should be deemed illegal *per se*. Even if this scheme is not facially *per se* illegal, the anticompetitive effects vastly outweigh any benefits and should be swiftly condemned under the rule of reason.

16.     Plaintiffs bring this suit against Defendants to recover all damages and obtain injunctive relief available under federal antitrust law.

II.     **THE PARTIES**

A.     **Plaintiffs**

17.     Plaintiff DHS is a durable medical device supplier. DHS is a Pennsylvania corporation with its principal place of business located at 35 Sarhelm Road, Harrisburg, Pennsylvania 17112.

18.     Plaintiff HOP is a Pennsylvania corporation with its principal place of business located at 35 Sarhelm Road, Harrisburg, Pennsylvania 17112. On November 14, 2012, DHS acquired HOP and HOP has been since that time a wholly owned, operated, and controlled affiliate of DHS and is registered to do business as "Dynamic Healthcare Services PA" with the Pennsylvania Department of State. HOP is also a durable medical device supplier and is the DHS affiliate entity that entered into financing agreements with DLL.

B.     **Defendants**

19.     Defendant Respironics is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15296. Respironics is the manufacturer of respiratory devices that are the subject of three separate recalls that have occurred over the past two-plus years. The first recall occurred in June 2021, and resulted from Respironics using an extremely hazardous material in its respiratory devices.

20.     Upon information and belief, Defendant DLL is a Michigan corporation authorized to do, and doing, business in the Commonwealth of Pennsylvania at all times material hereto. DLL is a specialist in financing and leasing medical equipment and operates at 1111 Old Eagle School Road, Wayne, PA 19087.

21.     Defendant PMC is a Delaware limited liability company that conducts business in the Commonwealth of Pennsylvania and has a principal place of business at 1111 Old Eagle School Road, Wayne, PA 19087.

22.     PMC is a joint venture between Philips and DLL.

## III.     JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

24.     This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Pennsylvania's long-arm statute, 42 Pa.C.S.A. § 5322.

25.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV.     FACTUAL ALLEGATIONS

### A.     The U.S. Respiratory Device Manufacturing Market Is A Relevant Antitrust Market.

26.     One of the relevant antitrust markets, to the extent one must be defined, to analyze the anticompetitive effects of Defendants' scheme is no broader than the manufacture and sale of respiratory devices in the U.S.

27.     The sleep industry recognizes respiratory devices as a relevant product market. Respiratory devices are used to assist breathing and are intended to help patients in need of

support for breathing, removal of carbon dioxide, and therapy to reduce disuse atrophy of abdominal wall muscles. Certain types of respiratory devices could also constitute relevant antitrust submarkets based on the particular needs and diagnoses of certain patients, including continuous ventilators, Bilevel Positive Airway Pressure (BiPAP) devices, and CPAP devices. Respiratory devices are not interchangeable with other treatments for OSA, such as mouth exercises and changes to a patient's diet.

28.     A patient seeking reimbursement for a respiratory device must meet certain requirements. Physicians prescribe respiratory devices because of their particular characteristics and uses when other treatments would not be sufficiently effective. Insurance payors only cover respiratory devices for patients whose doctor and Respiratory Device Supplier are enrolled in the insurance payor's network. Medicare will only cover respiratory devices that are prescribed by doctors and supplied by Respiratory Device Suppliers that are enrolled in Medicare.

29.     The relevant geographic market for respiratory devices is no broader than the U.S. Respiratory devices sold in the U.S. as regulated by the U.S. Food and Drug Administration (the "FDA"). Respiratory Device Manufacturers in the U.S. must have an established and strong reputation among U.S. customers for producing high-quality respiratory devices to compete effectively. Because of these and the foregoing considerations, the options for U.S. customers are limited to manufacturers with a U.S. presence and strong reputations in the U.S.

**B.     The U.S. Respiratory Device Financing Market Is a Relevant Antitrust Market.**

30.     One of the relevant antitrust markets, to the extent one must be defined, to analyze the anticompetitive effects of Defendants' scheme is no broader than the financing of respiratory devices in the U.S.

31.     Lenders providing Respiratory Device Financing in the U.S., including DLL and PMC, have teamed up with Respiratory Device Manufacturers, including Respironics, to offer lending terms to Respiratory Device Suppliers under which no other lenders can compete ("Respiratory Device Financiers"). Respiratory Device Financiers enter into joint ventures and/or exclusivity arrangements with U.S. Respiratory Device Manufacturers to foreclose competition from other lenders. For example, Respiratory Device Financiers commonly offer interest free Respiratory Device Financing to Respiratory Device Suppliers in the U.S., whereas other lenders—i.e., lenders that do not have exclusivity arrangements—cannot make such an offer and must offer financing based on current market conditions.

32.     Respiratory Device Suppliers in the U.S. cannot reasonably turn to lenders unaffiliated with Respiratory Device Manufacturers due to the material difference in interest rates offered by U.S. Respiratory Device Financiers. Lenders unaffiliated with U.S. Respiratory Device Manufacturers must set interest rates according to economic indicators and other factors—providing interest rates as high as 10%—whereas U.S. Respiratory Device Financiers can use their arrangements with U.S. Respiratory Device Manufacturers to set the interest rate at zero.

33.     DLL, PMC, and other Respiratory Device Financiers recognize this relevant market in their publicly available regulatory filings and marketing materials. Indeed, DLL touts its leading and dominant market position of over 30% in this market.

34.     The relevant geographic market for Respiratory Device Financing is no broader than the U.S. respiratory devices sold in the U.S. as regulated by the FDA, and Respiratory Device Financers must enter into joint ventures or other arrangements with U.S. Respiratory Device Manufacturers to compete in this market. Because of these and the foregoing

8

considerations, the options for U.S. customers and Respiratory Device Suppliers are limited to Respiratory Device Financiers with a U.S. presence and strong reputations in the U.S.

**C.     The U.S. Respiratory Device Suppliers Market Is A Relevant Antitrust Market.**

35.     One of the relevant antitrust markets, to the extent one must be defined, to analyze the anticompetitive effects of Defendants' scheme is no broader than Respiratory Device Suppliers in the U.S.

36.     Respiratory Device Suppliers must have U.S. sales representatives and support capabilities to provide their OSA patients with assistance, education, and monitoring. Sales representatives also typically visit physicians to demonstrate products, provide educational materials, and develop relationships that are important to driving sales of respiratory devices. To compete effectively, Respiratory Device Suppliers must also have an established and strong reputation among U.S. customers for supplying high-quality respiratory devices. Because of these considerations, the options for U.S. customers are limited to Respiratory Device Suppliers with a U.S. presence.

37.     The relevant geographic market for U.S. Respiratory Device Suppliers is no broader than the U.S. To meet patient demand, U.S. Respiratory Device Suppliers must keep hundreds of respiratory devices in inventory for quick delivery to patients in the U.S. Respiratory Suppliers without a U.S. presence cannot effectively compete for U.S. patients.

**D.     Defendants' Concerted Refusal to Deal**

38.     DHS is a Respiratory Device Supplier. It purchases respiratory devices from Respiratory Device Manufacturers using Respiratory Device Financing and then leases respiratory devices to OSA patients as part of a clinical program that includes training, education, and monitoring of OSA patients.

39.  Respironics manufactures and sells respiratory devices and sells them to Respiratory Device Suppliers and other customers.

40.  PMC is a joint venture between Philips and DLL that provides Respiratory Device Financing only to Respironics' customers. DLL and Philips entered into a Limited Liability Company Agreement, dated August 16, 2002, to form PMC, a limited liability company. DLL and Philips are PMC's Members. DLL holds a 60% controlling interest in PMC, and Philips holds the other 40%.

41.  Upon information and belief, PMC operates independently and separate and apart from DLL. Specifically, PMC is run by an independent set of directors and officers; PMC and DLL do not share a single center of decision making; and PMC and DLL do not maintain a single aggregation of economic power.

42.  PMC and Philips—the latter acting through a division doing business as Philips Medical Systems North America Company—entered into an Operating Agreement, dated August 16, 2002, governing the leasing and financing of products offered for sale by the Philips Medical Division (the "Operating Agreement").

43.  Philips Medical Division consists of different Philips entities that sell various Philips products that are financed by PMC pursuant to the Operating Agreement.

44.  PMC, Philips, and Respironics entered into a Third Amendment to the Operating Agreement (the "Third Amendment"), dated September 16, 2009, which expanded the term "Philips Medical Division" to include Respironics and all Respironics subsidiaries. Consistent with the Third Amendment, PMC would provide financing for the purchase of Respironics devices and equipment.

45.     Beginning in 2015, DHS sought an arrangement with Respironics to purchase certain respiratory devices. Respironics informed DHS that PMC could provide financing to DHS at 0% interest in exchange for DHS paying Respironics a higher than market purchase price per Respiratory Device.

46.     On December 14, 2015, DHS and PMC memorialized the arrangement by entering into a Master Lease Agreement ("MLA"). The MLA set forth, among other things, the process by which PMC and DHS would enter into subsequent purchase and payment schedules ("Leases") once DHS purchased the respiratory devices directly from Respironics.

47.     Pursuant to the MLA, DHS purchased respiratory devices directly from Respironics at pre-determined prices, and Respironics invoiced DHS for the respiratory devices it purchased. Respironics shipped the respiratory devices that DHS purchased directly to DHS or to a third party designated by DHS. Within 90 days after receiving each invoice from Respironics, DHS financed the respiratory devices purchased from Respironics with PMC by grouping all respiratory device purchases from Respironics into a 12-month payment installment contract. DHS then supplied the respiratory devices to its patient customers, and DHS patients, or their insurance payors, made monthly payments to DHS. DHS and PMC followed this process for at least 50 leases, until the Respironics recall.

48.     DHS secured each lease with PMC with the corresponding respiratory devices that DHS purchased from Respironics.

49.     Prior to the Respironics recalls, Respironics was the dominant Respiratory Device Manufacturer in the U.S. and PMC was the provider of Respiratory Device Financing authorized to do business with Respironics.

50.     From December 2015 until the middle of 2021, Respironics sold respiratory devices to DHS, PMC financed each of those purchases, and DHS complied with PMC's financing terms.

51.     DHS acquired HOP, a Respiratory Device Supplier, in 2012. Since that time, DHS has operated HOP as a wholly-owned subsidiary that does business as "Dynamic Healthcare Services PA."

52.     HOP contracts with Respiratory Device Manufacturers for the purchase of respiratory devices and leases the respiratory devices to its customers. HOP, like other Respiratory Device Suppliers, needs Respiratory Device Financing in order to purchase sufficient respiratory devices to operate its Respiratory Device Supplier business.

53.     HOP entered into an arrangement with ResMed to purchase respiratory devices. ResMed offered Respiratory Device Financing to HOP through one of its two exclusive providers of Respiratory Device Financing, DLL and Wells Fargo. HOP was assigned to DLL for purposes of obtaining Respiratory Device Financing. ResMed worked with HOP and DLL to secure Respiratory Device Financing for HOP. DLL agreed to finance HOP's purchases of ResMed respiratory devices at 0% interest rates in exchange for certain benefits sent back to DLL from ResMed.

54.     Pursuant to the arrangement, HOP purchased ResMed respiratory devices directly from ResMed, and ResMed invoiced HOP for those purchases. ResMed shipped the respiratory devices HOP purchased directly to HOP or to one of HOP's designated third parties. Within 90 days after receiving each invoice from ResMed, HOP financed its ResMed purchases with DLL by grouping its purchases into 12-month payment installment contracts. HOP supplied the

respiratory devices to its customers, and HOP's customers, or their insurance payors, made monthly payments to HOP.

55.     HOP secured each lease with DLL with the corresponding equipment that HOP purchased from ResMed.

56.     HOP's relationship with DLL was memorialized through various finance agreements.

57.     On April 26, 2021, Respironics disclosed publicly, for the first time, that certain respiratory devices that it had been manufacturing and selling in the U.S. posed health risks to OSA patients.

58.     On June 14, 2021, Respironics announced that it was recalling several models of respiratory devices "to address identified potential health risks" related to those respiratory devices manufactured and sold in the U.S., including hundreds of respiratory devices that DHS had purchased from Respironics and financed through PMC (the "Recalled Devices").

59.     Respironics stated that continued use of the Recalled Devices by OSA patients was associated with numerous potential health conditions, including "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects." Respironics' announcement to physicians treating OSA patients advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."

60.     In June 2021, Respironics admitted that the Recalled Devices were defective and unsafe. Respironics instructed DHS to refrain from leasing and/or otherwise supplying the Recalled Devices to DHS' customers. Respironics also instructed DHS to notify DHS' customers about the Recalled Devices and to instruct customers to refrain from using any of the

Recalled Devices in their possession.  DHS' current inventory includes approximately 1,000 Recalled Devices.

61.     On July 22, 2021, the FDA confirmed the severity of the issues associated with the Recalled Devices and classified the recall as Class I—"the most serious type of recall"— meaning use of the Recalled Devices may cause serious injuries or death.

62.     When Respironics first announced the recall on June 14, 2021 and for many months thereafter, Respironics did not offer any of its Respiratory Device Suppliers, including DHS, any options regarding remediation of the Recalled Devices or exchange of the Recalled Devices for safe respiratory devices.

63.     On September 1, 2021, Respironics received authorization from the FDA to begin a remediation process for certain Recalled Devices in the U.S.  At the time, Respironics estimated that it would take one year to complete the remediation program.

64.     Respironics announced a remediation program for patients that had been leasing certain Recalled Devices. Respironics remediation program, to date, has failed to adequately remediate all Recalled Devices in Respiratory Device Suppliers' possession and/or adequately compensate Respiratory Device Suppliers for the Recalled Devices that they purchased and can no longer provide to OSA patients.

65.     Since the June 2021 recall of respiratory devices manufactured by Respironics, Respironics has announced two additional recalls related to its respiratory devices.

66.     For many years prior to 2021, Respironics knew that some of its respiratory devices could seriously harm OSA patients using those respiratory devices. On November 9, 2021, the FDA issued a report of its investigation in which it concluded that Respironics knew, beginning in at least 2008, of the issues and that Respironics had received hundreds of thousands

of customer complaints regarding issues with the Recalled Devices, yet it never informed its Respiratory Device Suppliers, patients, physicians, or the general public.

67. According to the FDA's findings, Respironics was well aware of the serious health risks posed by the Recalled Devices prior to the time DHS began purchasing the Recalled Devices and entering into the Respiratory Device Financing arrangement with PMC for those purchases. In connection with its investigation, the FDA determined that the Recalled Devices failed to comply with "current good manufacturing practice" requirements ("CGMPs") codified in FDA regulations. Under 21 U.S.C § 351(h), devices that are not manufactured in compliance with the FDA's CGMPs "shall be deemed adulterated." Accordingly, the Recalled Devices were adulterated and should have been prohibited for sale, delivery, or receipt.

68. Immediately after Respironics' recall announcement in June 2021, DHS instructed its customers to cease using the Recalled Devices. As a result, DHS's customers stopped making monthly lease payments to DHS for the Recalled Devices and DHS was left with, and still possesses, nearly 1,000 Recalled Devices in its inventory that it cannot not provide to patients. Despite the fact that Respironics had failed to initiate a sufficient remediation plan to assist DHS, and other Respiratory Device Suppliers, in exchanging the Recalled Devices for safe and effective respiratory devices, PMC continued to demand payment for the Recalled Devices under open finance agreements with DHS.

69. Specifically, DHS and PMC had ten open finance agreements that covered Recalled Devices ("Leases 41-50").

70. DHS and PMC had discussions regarding restructuring the terms of the loans due to the June 2021 Respironics Recall.

71.     Initially, PMC offered DHS payment deferrals on Leases 41-50, which would extend until such time as DHS and PMC reached a restructured payment plan for both Recalled Devices and other respiratory devices purchased by DHS from Respironics and financed through PMC.

72.     In July 2022, PMC and DHS appeared close to reaching a final resolution on the restructure whereby DHS would make payments to PMC under Leases 41-50 for respiratory devices that excluded the Recalled Devices, and Respironics would complete a full remediation of the Recalled Devices that DHS had purchased and had in its possession. During this time, PMC continued to indicate that DHS' payment obligations to PMC were deferred pending final resolution.

73.     On August 18, 2022, PMC informed DHS that it was in default under Leases 41-50. On or around that date, PMC shared commercially and competitively sensitive information about DHS with DLL and ResMed, respectively.

74.     For example, on August 23, 2022—just five days after PMC declared DHS in default under the MLA and Leases 41-50—DLL, without notice, placed HOP on a finance hold and told HOP that it would refuse to finance HOP's pending and future respiratory device purchases with ResMed.

75.     On that same day, August 23, 2022, ResMed also placed HOP on a hold from purchasing respiratory devices from ResMed because DLL froze HOP's financing.

76.     At all materially relevant times up to and including August 23, 2022, HOP had complied with all of its Respiratory Device Financing arrangements with DLL related to the purchase of ResMed respiratory devices.

77.     Rather than continue to negotiate with DHS in good faith regarding remediation for the Recalled Devices, Respironics, PMC, and DLL engaged in concerted conduct to foreclose DHS and HOP from being able to purchase respiratory devices in the U.S. by sharing commercially sensitive information and leveraging their dominance in the Respiratory Device Manufacturing market and the market for Respiratory Device Financing, respectively.

78.     In a concerted effort to force DHS to make supracompetitive payments to PMC for Recalled Devices, Defendants conspired to refuse to deal with DHS and HOP and to foreclose DHS and HOP from Respiratory Device Financing and being able to purchase respiratory devices manufactured in the U.S.

79.     On August 23, 2022, DHS and HOP reached out to ResMed to inquire about the financing hold and purchasing prohibition.

80.     On August 24, 2022, HOP signed a new lease with DLL, which HOP believed would remove the finance freeze from its account.

81.     On August 25, 2022, DLL informed HOP that it would approve the new DLL lease, but that DLL would not provide Respiratory Device Financing to HOP for any additional leases because of PMC's declaration of default against DHS. DLL's actions were taken in concert with PMC and Respironics to force DHS into restructuring its lease agreements with PMC on terms beneficial to PMC, Respironics, and DLL.

82.     On August 30, 2022, based on information it learned from DLL, Respironics, and PMC, ResMed informed DHS that DLL would refuse to finance respiratory devices purchases by DHS and HOP and that ResMed would place DHS and HOP on hold for all current and future respiratory device purchases. Due to the recall affecting Respironics' respiratory devices,

ResMed would soon have a lead position in the respiratory devices market, and DLL leveraged that dominance to punish DHS and HOP.

83.     DLL's communications with DHS and HOP expressly show that PMC and Respironics were sharing commercially and competitively sensitive information with their competitors and leveraging their dominant positions in the Respiratory Device Financing market and Respiratory Device Manufacturing market, respectively, to force DHS into unfavorable payment and finance terms with PMC regarding the Recalled Devices.

84.     Upon information and belief, PMC's and Respironics' actions in sharing commercially and competitively sensitive information with their competitors was taken with knowledge that DLL would further this scheme by taking immediate action against DHS's owned affiliate, HOP. Indeed, although PMC operates independently and separate and apart from DLL, DLL's financial and ownership interest in PMC creates an environment where DLL is able to leverage its dominant position in the Respiratory Device Financing market to force Respiratory Device Suppliers to make supracompetitive payments—*e.g.*, DHS being forced into unfavorable payment and finance terms with PMC regarding the Recalled Devices.

85.     Upon information and belief, DLL was orchestrating this scheme against other Respiratory Device Suppliers as well.

86.     As a result of this anticompetitive scheme, Respiratory Device Suppliers, OSA patients, and insurance payers were forced to pay supracompetitive interest rates and prices for respiratory devices manufactured in the U.S. and OSA patients' access to safe and effective respiratory devices was being foreclosed. While patients waited for safe and effective respiratory devices, the health risks associated with their OSA were exacerbated.

87.     Defendants' concerted actions, including sharing of commercially and competitively sensitive information between competitors and leveraging their respective dominant market positions, caused significant harm to Respiratory Device Suppliers and to OSA patients that could not access safe and effective respiratory devices to treat their OSA.

88.     Defendants' concerted refusal to deal with HOP is facially anticompetitive because it served no procompetitive benefit and only harmed competition for the supply of respiratory devices resulting in less access and supracompetitive prices and higher interest rates for respiratory devices in the U.S. As a result, Defendants' scheme is *per se* illegal.

89.     Even if the Defendants' concerted refusal to deal and sharing of competitively sensitive information does not amount to a *per se* violation, it constituents a violation of Sherman Act Section 1 pursuant to a quick look analysis or a full-blown rule of reason analysis because Defendants' conspiracy has no rational business justification.

## COUNT 1

**Unlawful Agreements in Restraint of Trade under Sherman Act Section 1**
**15 U.S.C. § 1**
**(Defendants' Concerted Refusal to Deal and Monopoly Leveraging)**

90.     Plaintiffs incorporate by reference all of their previous allegations as if fully set forth herein.

91.     PMC, Respironics, and DLL unlawfully conspired to restrain trade by agreeing that PMC and DLL would not enter into any Respiratory Device Financing with DHS or HOP.

92.     HOP and DHS had fulfilled their obligations to ResMed and DLL prior to PMC and Respironics sharing commercially sensitive information with DLL and ResMed for the sole purpose of forcing DHS into an unfavorable resolution of its dispute with PMC regarding Recalled Devices. There was no business justification for DLL to refuse to deal with DHS or HOP.

93.     PMC's, Respironics's, and DLL's actions constitute a *per se* refusal to deal with DHS, HOP, and other Respiratory Device Suppliers impacted by Recalled Devices.

94.     PMC's, Respironics's, and DLL's concerted actions have no rational business justification and are designed solely to injure DHS's and HOP's ability to compete and supply OSA patients by cutting off or curtailing their supplies and financing for respiratory devices and forcing OSA patients to forego life-saving respiratory devices or to pay supracompetitive prices for respiratory devices.

95.     As a result of PMC's, Respironics's, and DLL's conspiracy to refuse to deal with DHS and HOP, DHS and HOP have been (i) foreclosed from financing or forced to pay higher financing rates for their purchases of respiratory devices with Respiratory Device Financiers in the U.S., (ii) coerced into paying full price for respiratory devices subject to a Class I FDA recall, and (iii) unable to adequately supply respiratory devices to their patients.

96.     As a result of PMC's, Respironics's, and DLL's anticompetitive conduct, DHS and HOP have been damaged in an amount to be determined at trial, which amount shall be trebled, and shall include costs of the action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Respironics, DLL, and PMC as to Count I, including:

   a.   A judgment finding that DLL's, Respironics's, and PMC's agreement in restraint of trade violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

   b.   A judgment awarding DHS and HOP all appropriate damages in an amount to be determined at trial;

   c.   A judgment awarding DHS and HOP prejudgment and post-judgment interest, as permitted by law;

d.  A judgment awarding DHS and HOP punitive damages, treble damages, and costs and fees, including attorneys' fees, as permitted by law; and

e.  Such other legal, equitable, or further relief as the Court may deem just and proper.

[*Remainder of page intentionally left blank.*]

### JURY DEMAND

Plaintiffs Dynamic Healthcare Services, Inc. and Hometown Oxygen, Pittsburgh LLC

demand a trial by jury of twelve (12) jurors

Respectfully submitted:

**DUANE MORRIS LLP**

By: _/s/ Bryan N. Shapiro_____

Bryan N. Shapiro (329241)
Matthew A. Taylor (62098)
30 South 17th Street
Philadelphia, PA 19103-4196
T: (215) 979-1000
e:         MATaylor@duanemorris.com
           BShapiro@duanemorris.com

*Attorneys for Plaintiffs Dynamic Healthcare Services, Inc. and Hometown Oxygen, Pittsburgh LLC*

Dated: July 15, 2024