**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DYNAMIC HEALTHCARE SERVICES, INC., and HOMETOWN OXYGEN, PITTSBURGH LLC,**<br><br>          **Plaintiffs,**<br><br>     **vs.**<br><br>**DE LAGE LANDEN FINANCIAL SERVICES, INC., PHILIPS RS NORTH AMERICA LLC f/k/a RESPIRONICS, INC.**<br><br>          **Defendants.** | Case No. 2:24-cv-03058<br><br>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RESPIRONICS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>Judge:  Hon. Kai Scott |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

FACTUAL BACKGROUND .................................................................................5

STANDARD OF REVIEW ...................................................................................7

ARGUMENT .........................................................................................................8

I.  PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY, AND THEREFORE
    LACK ANTITRUST STANDING. ...............................................................8

    A.  Plaintiffs Improperly Seek Redress Under the Antitrust Laws for Private
        Concerns and Not Harm to Competition. ...........................................9

    B.  Absent Factual Allegations of Market-Wide Harm to Competition,
        Plaintiffs Cannot Plausibly Plead That It Suffered Antitrust Injury That
        Flowed from Defendants' Conduct......................................................10

    C.  Plaintiffs' Alleged Injury Stems From A Breach Of Contract, Not
        Anticompetitive Conduct. ..................................................................12

II. PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE CONSPIRACY CLAIM....................14

    A.  Plaintiffs Fail to Allege Sufficient Facts to Establish An Agreement. .................14

    B.  Plaintiffs Fail to Allege Sufficient Facts to Establish Any Participation by
        Respironics in an Alleged Agreement to Deny Plaintiffs Financing....................16

III. PLAINTIFFS' NONSENSICAL CLAIMS DO NOT WARRANT PER SE
     TREATMENT. ...........................................................................................18

IV.  PLAINTIFFS FAIL TO ALLEGE ANTICOMPETITIVE EFFECTS IN ANY
     RELEVANT MARKET IN WHICH RESPIRONICS PARTICIPATES. .......................21

    A.  Respironics Does Not Compete In the Alleged Relevant Market Where
        Plaintiffs Claim Competition Was Restrained.....................................21

    B.  Plaintiffs Fail to Properly Allege Foreclosure In the Respiratory Device
        Financing Market. ...............................................................................23

CONCLUSION....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................7, 8

*Assoc. Gen. Contractors v. Carpenters*,
459 U.S. 519 (1983)..............................................................................................11

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990).................................................................................2, 8, 9, 19

*Bassett v. NCAA*,
No. 04–425, 2005 WL 3767016 (E.D. Ky. May 3, 2005) ....................................16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................3, 14, 18, 20

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)..............................................................................................13

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
239 F. Supp. 2d 550 (E.D. Pa. 2002) ...................................................................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)................................................................................................8

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)...............................................................................12

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)...................................................................................2

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1998)....................................................................................3, 4, 19

*In re Cardizem CD Antitrust Litig.*,
332 F.3d 896 (6th Cir. 2003) ...............................................................................19

*Christofferson Dairy, Inc. v. MMM Sales, Inc.*,
849 F.2d 1168 (9th Cir. 1988) .............................................................................10

*Chrysler Corp. v. Fedders Corp.*,
643 F.2d 1229 (6th Cir. 1981) ...............................................................................9

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ...........................................................................................19

*In re Elec. Carbon Products Antitrust Litig.*,
    333 F. Supp. 2d 303 (D.N.J. 2004) ..........................................................16, 18

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ................................................................................8

*Gordon v. Lewistown Hosp.*,
    423 F.3d 184 (3d Cir. 2005) ..............................................................................21

*Gregory Mktg. Corp. v. Wakefern Food Corp.*,
    787 F.2d 92 (3d Cir. 1986) ................................................................................11

*Host Int'l v. MarketPlace, PHC, LLC*,
    32 F.4th 242 (3d Cir. 2022) ....................................................................9, 13, 24

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237, 253 (3d Cir. 2010) .......................................................................4

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ..............................................................................20

*Johnson v. Univ. Health Servs., Inc.*,
    161 F.3d 1334 (11th Cir. 1998) ........................................................................10

*Jung v. Assoc. of American Medical Colleges*,
    300 F. Supp. 2d 119 (D.D.C. 2004) ..................................................................18

*Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*,
    670 F.2d 421 (3d Cir. 1982) ...........................................................................3, 19

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877, 886 (2007) ..................................................................................19

*Martin B. Glauser Dodge Co. v. Chrysler Corp.*,
    570 F.2d 72 (3d Cir. 1977), *cert. denied*, 436 U.S. 913 (1978) ........................2

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
    853 F. Supp. 837 (E.D. Pa. 1994), *amended*, 857 F. Supp. 455 (E.D. Pa.
    1994), *aff'd* 107 F.3d 1026 (3d Cir. 1997) .......................................................19

*Northeast Women's Center, Inc. v. McMonagle*,
    670 F. Supp. 1300 (E.D. Pa. 1987) .....................................................................2

*Novak v. Somerset Hosp.*,
    625 F. App'x 65 (3d Cir. 2015) ...........................................................................8

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...........................................................................................12

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
    948 F. Supp. 2d 416 (M.D. Pa. 2013) ............................................................ *passim*

*Philips Medical Capital, LLC v. Dynamic Healthcare Services, Inc.*,
    Case No. 2022-07746 (Chester County, Pennsylvania) (filed on September 30,
    2022) ..................................................................................................................1

*Retina Assocs. v. S. Baptist Hosp. of Fla., Inc.*,
    105 F.3d 1376 (11th Cir. 1997) .........................................................................19

*Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008).................................................................................8

*Travelers Ins. Co. v. Blue Cross of W. Pa.*,
    481 F.2d 80 (3d Cir. 1973)...............................................................................2, 8

*West Penn Allegheny Health System, Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010).......................................................................4, 10, 11

**Statutes**

Sherman Act
    § 1.................................................................................................... *passim*
    § 4..........................................................................................................19

**Other Authorities**

Article III ..........................................................................................................8

## INTRODUCTION

This case is the latest from a serial litigant concerning a garden-variety commercial contract dispute.[1]  The allegations are not conceivably an antitrust claim under Section 1 of the Sherman Act.  While Plaintiffs attempt to cloak the consequences of their own payment default for respiratory devices supplied by Respironics with antitrust buzzwords, the factual allegations themselves fall far short of describing any anticompetitive conduct, anticompetitive harm, antitrust injury, or conspiracy in any alleged relevant product market by Respironics or other Defendants.

The basic allegations are these:  Plaintiff DHS purchased continuous positive airway pressure (CPAP) and other respiratory devices from Respironics.  Compl. ¶¶ 2, 6-7.  In order to finance those purchases, DHS contracted with Co-Defendant Philips Medical Capital ("PMC), a joint venture between Co-Defendant De Lage Landen Financial Services, Inc. ("DLL") and Philips North America LLC ("Philips").  *Id.* ¶¶ 8-10.  HOP (a legal entity owned and controlled by DHS) purchased respiratory devices from non-party ResMed, and financed its purchases through DLL.  *Id.* ¶¶ 18, 53.  Plaintiffs claim that, following DHS's default on payments for various respiratory device purchases after a recall of a subset of those devices, Respironics unlawfully conspired with PMC and DLL to restrain trade by agreeing that PMC and DLL would not enter into any Respiratory Device Financing with DHS or HOP.  *See id.* ¶¶ 13-14, 91.  Plaintiffs allege specifically that Respironics, PMC, and DLL engaged in an "anticompetitive scheme" to "foreclose competition from other lenders and Respiratory Device Manufacturers."

---

[1] Indeed, the Parties are engaged in two other civil litigations related to the breach of the Master Lease Agreement and leases following the June 2021 recall of respiratory devices at issue in this Complaint.  *See Philips Medical Capital, LLC v. Dynamic Healthcare Services, Inc.,* Case No. 2022-07746 (Chester County, Pennsylvania) (filed on September 30, 2022); *Dynamic Healthcare Services, Inc. and Hometown Oxygen, Pittsburgh LLC v. Phillips Medical Capital LLC, De Lage Landen Financial Services, Inc. and Philips RS North America LLC f/k/a Philips Respironics, Inc.,* 2024-04170-TT (Chester County, Pennsylvania) (filed on May 15, 2024).

*Id.* ¶ 14.

As a threshold matter, in order to have standing to bring an antitrust claim, a plaintiff must allege injury to competition in a relevant market, that is, "antitrust injury," and not merely allege injury to itself. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Further, an antitrust plaintiff must plead the following to make out a Section 1 claim: (1) that the defendant was party to a "contract, combination ... or conspiracy," and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citation and quotation marks omitted); *see also Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3d Cir. 1977), *cert. denied*, 436 U.S. 913 (1978); *Northeast Women's Center, Inc. v. McMonagle*, 670 F. Supp. 1300, 1303-1304 (E.D. Pa. 1987).  Plaintiffs fail to sufficiently plead each of these requirements to sustain a Section 1 claim, and their complaint must be dismissed.

*First*, Plaintiffs have not suffered antitrust injury and therefore lack antitrust standing to pursue its Sherman Act claim.  The federal antitrust laws "protect competition, not competitors." *Travelers Ins. Co. v. Blue Cross of W. Pa.*, 481 F.2d 80, 84 (3d Cir. 1973).  This means an antitrust plaintiff "is required to prove more than just its business' injury." *McMonagle*, 670 F. Supp. at 1304; *see Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 432 (M.D. Pa. 2013) ("[a]lleged harms that are causally related to Defendant's complained-of conduct, but are not alleged to have occurred as a result of lessened competition—do not qualify as antitrust injury.").  Here, Plaintiffs allege only business harm to themselves, pursuant to terms of their own contracts, rather than a lessening of competition in any relevant market. Specifically, the only harm alleged is that, following DHS's payment default to PMC, Plaintiffs were unable to obtain the preferential 0% financing for respiratory device purchases that

Defendants PMC and DLL previously offered.  Compl. ¶¶ 83-84.  Notably absent from the Complaint, however, are facts to support any allegations that Defendants' actions negatively impacted any aspect of market competition, such as increased device prices for patients, decreased output or quality of supplier services to patients, or stifled innovation.[2]

*Second*, Plaintiffs fail to allege sufficient facts to support a conspiracy claim.  Under *Twombly*'s pleading standard, a plaintiff must provide enough facts to suggest that the defendants entered into an illegal agreement.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  Allegations of parallel conduct that are merely consistent with an agreement—without more—are not enough to allow a claim to proceed.  *Id.*  Plaintiffs here plead insufficient facts to support existence of an illegal agreement, offering only conclusory allegations that PMC, DLL, and Respironics "conspired" to freeze Plaintiffs out of the alleged respiratory financing market. Compl. ¶¶ 82-88.  And with respect to Respironics – the CPAP device *manufacturer* - specifically, Plaintiffs plead *no* facts to support any alleged involvement in an agreement by Respironics to deny financing to DHS, HOP, or any other respiratory supplier.

*Third*, Plaintiffs' nonsensical claims do not justify *per se* treatment.  *Per se* review is typically limited to cases involving horizontal agreements among direct competitors.  *See, e.g., Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 734 (1998); *Larry V. Muko, Inc. v. Sw. Pa. Bldg. & Constr. Trades Council*, 670 F.2d 421, 429 (3d Cir. 1982) ("Generally, the application of the *per se* rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace.").  Plaintiffs here do not allege a horizontal agreement among direct competitors

---

[2] This absence of allegations is likely incurable given that Plaintiffs allege non-party ResMed now has a "lead position" in the respiratory devices manufacturing market, Compl. ¶ 82, with 62% market share, *id.* ¶ 6.  Plaintiffs also fail to allege what portion of the alleged U.S. Respiratory Device Supplier market DHS and HOP comprise, and whether conduct that affected their businesses specifically affected *competition* in that market more broadly.

that would warrant *per se* treatment, but parties that span vertical relationships with Defendants as financiers (PMC and DLL) and a device manufacturer (Respironics), and Plaintiffs as suppliers.  Thus, the alleged concerted refusal to deal with Plaintiffs and to foreclose them from financing should receive a rule of reason analysis.  *See, e.g.*, *Bus. Elecs. Corp.*, 485 U.S. at 726 ("there is a presumption in favor of a rule-of-reason standard").

*Fourth*, even if Plaintiffs' allegations of the existence of an agreement were sufficient— they are not—Plaintiffs fail to adequately plead the unreasonable-restraint element of a conspiracy.  Specifically, Plaintiffs offer no factual allegations that the "conspiracy" produced any anticompetitive effects in the alleged relevant markets.  *See West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) (citing *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010)).  Plaintiffs allege harm only to themselves in the form of less favorable financing terms, not harm to the alleged Respiratory Supplier Market or Respiratory Device Financing Markets more broadly, which is insufficient to support their Section 1 claim.

In short, none of Plaintiffs' factual allegations give rise to an antitrust claim under Section 1 of the Sherman Act.  Rather, Plaintiffs describe a sequence of events consistent with competition:  lenders enforcing their contracts after a payment default, specific to the parties involved and not to any alleged relevant market more broadly.  Yet Plaintiffs have conjured up a "concerted refusal to deal" theory by which Respironics—who is not even a party to the subject contracts—conspired with lenders PMS and DLL to deny financing to Plaintiffs.  Plaintiffs describe no lessening of competition or anticompetitive harm, only commercial disagreement that they no longer have access to 0% financing for a set of financing agreements.  At bottom, while Plaintiffs try to invoke antitrust concepts, their allegations only describe a basic contract

4

dispute, which has nothing to do with harm to competition in any alleged relevant market or violation of Section 1 of the Sherman Act.

Accordingly, the Court should dismiss this complaint for failure to state a claim on which relief may be granted.

## FACTUAL BACKGROUND

Respironics makes respiratory devices, including CPAP, BiPAP, and ventilator devices. Compl. ¶ 39.  Plaintiffs DHS and HOP are respiratory device suppliers who purchase respiratory devices from respiratory device manufacturers, including Respironics.  *Id.* ¶¶ 5-7.  DHS's purchases of CPAP devices from Respironics were financed through PMC, a joint venture between lender DLL and a Respironics affiliate (sister company of Respironics' parent company), Philips North America.  *Id.* ¶¶ 10, 45.  In December 2015, DHS and PMC entered into a Master Lease Agreement ("MLA") (Exhibit A), which laid out payment schedules following DHS's purchase of respiratory devices from Respironics.  *Id.* ¶ 46.  Respironics is not a party to this lease.  *See id.*  DHS purchased respiratory devices from Respironics, and Respironics invoiced DHS for those devices.  *Id.* ¶ 47.  Within 90 days of receiving an invoice from Respironics, DHS financed the devices with PMC by grouping its device purchases from Respironics into a 12-month payment installment contract.  *Id.*  DHS and PMC followed this process for at least 50 leases.  *Id.*

DHS later acquired HOP, who contracted with respiratory device manufacturer ResMed (not a party to this action) to purchase respiratory devices.  *Id.* ¶ 51-53.  HOP financed its respiratory devices purchases from ResMed through the respiratory device lender, DLL.  *Id.* ¶¶ 53-54.  Respironics is not a party to this lease, either.

Plaintiffs allege that on June 14, 2021, Respironics announced a recall of several models

of respiratory devices, the "Recalled Devices", as well as two additional recalls of respiratory

devices after June 2021.  Compl. ¶¶ 58, 65.  After the June 2021 recall announcement, DHS

claims that it "was unable to make payments to PMC under the financing arrangements for the

Recalled Devices."  *Id.* ¶ 11.  PMC offered DHS payment deferrals on both the Recalled Devices

and other, non-recalled respiratory devices that DHS purchased from Respironics during this

time.  *Id.* ¶¶ 71-72.  After failed attempts to restructure DHS' payment plan, PMC declared DHS

in default in relation to its Respironics financing arrangements.  *Id.* ¶¶ 13, 70-73.  DHS now

alleges that Respironics and PMC shared "confidential, commercial information" (presumably

referring to DHS' default) with DLL, who then informed ResMed and HOP "it would no longer

do business with HOP until DHS paid PMC for the recalled respiratory devices DHS had

purchased from Respironics."  Compl. ¶¶ 13, 73-75.

   Plaintiffs claim that these alleged acts demonstrate a "concerted effort to force DHS to

make supracompetitive payments to PMC for Recalled Devices," and that "Defendants conspired

to refuse to deal with DHS and HOP and to foreclose DHS and HOP from Respiratory Device

Financing and being able to purchase respiratory devices manufactured in the U.S."  *Id.* ¶ 78.

   Absent from Plaintiffs' complaint are facts critical to the antitrust claims they attempt to

bring.  For instance, Plaintiff fails to allege any of the following:

- Facts supporting any involvement by Respironics in an alleged agreement to "cut off
  financing or leasing programs" to DHS or HOP, for example, who at Respironics
  participated in this agreement, when, or where;

- Facts demonstrating a conscious agreement by any of the Defendants to cut DHS or
  HOP out of any relevant market, as opposed to merely reacting to DHS's failure to
  pay what it contractually owed PMC;

- Facts supporting Plaintiffs' claim that other U.S. Respiratory Device Suppliers besides Plaintiffs could not obtain respiratory device financing, for example, which other U.S. Respiratory Device Suppliers were affected by PMC and DLL's decision to stop providing zero-percent financing to DHS and HOP, or what portion of the alleged relevant market was affected by that same decision;

- Facts demonstrating why DHS and HOP could not obtain financing from other lenders;

- What portion of the alleged U.S. Respiratory Supplier market DHS and HOP make up, to support how any impact to Plaintiffs specifically would affect the relevant market more broadly, or

- Facts connecting PMC and DLL's alleged decision to cease financing DHS and HOP's respiratory device purchases to any alleged market-wide harm, for example, whether respiratory device prices actually increased following Defendants' alleged conduct, and if so, by how much; how end patients' access to respiratory devices was "foreclosed", for example, if the quantity of respiratory devices in the market declined and by how much, or any other facts to show how an upstream financing decision impacted competition in any of the alleged relevant markets.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A complaint meets this plausibility requirement only where it contains factual allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Where the allegations

are "merely consistent with" misconduct, a complaint fails to state a claim. *Id.* (citation omitted).

In applying this standard, courts in the Third Circuit first must separate the well-pleaded facts from conclusory allegations, and disregard the latter. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). A court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief,'" *id.* at 211, which is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *Iqbal*, 556 U.S. at 679.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO PLEAD ANTITRUST INJURY, AND THEREFORE LACK ANTITRUST STANDING.

Antitrust standing is a threshold requirement in all antitrust cases and is separate and distinct from Article III standing.[3] *See Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008). In order to have standing to bring an antitrust claim, a plaintiff must allege injury to competition in a relevant market, and not merely allege injury to himself. *Atl. Richfield Co.*, 495 U.S. at 334; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). In other words, the federal antitrust laws "protect competition, not competitors," and where a plaintiff fails to allege harm that proximately flows from market-wide anticompetitive effects, its claim under the federal antitrust laws must fail. *Travelers Ins. Co.*, 481 F.2d at 84. Where a complaint's assertions amount to conclusory and "threadbare recitals" of the elements of antitrust injury, they are insufficient to state a claim. *Iqbal*, 556 U.S. at 663; *see also Atl. Richfield Co.*, 495 U.S. at 334.

---

[3] "Antitrust standing augments the 'case or controversy' requirement under Article III, but does not affect the subject matter jurisdiction of the court.' Rather, it simply 'prevents a plaintiff from recovering under the antitrust laws.'" *Novak v. Somerset Hosp.*, 625 F. App'x 65, 67 (3d Cir. 2015). Thus, to succeed, an antitrust plaintiff must establish both antitrust and Article III standing.

### A.    Plaintiffs Improperly Seek Redress Under the Antitrust Laws for Private Concerns and Not Harm to Competition.

Properly alleging antitrust injury here would require DHS and HOP to show that any action by Defendants harmed competition in the alleged relevant markets, and not just their own business.  *See Host Int'l v. MarketPlace, PHC, LLC*, 32 F.4th 242, 250 (3d Cir. 2022) ("pleading an antitrust injury requires a plaintiff to prove that [the] challenged conduct affected the prices, quantity or quality of goods or services, not just [its] own welfare.") (citation omitted).  But Plaintiffs make no attempt to allege facts that connect their injury to the purpose of the antitrust laws.  *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1235 (6th Cir. 1981) (no antitrust injury where plaintiff failed to show the "essential connection between injury and the aims of the antitrust laws" (citation omitted)).

Instead, the only injury that Plaintiffs allege with any specificity is that Defendants "force[d] DHS into unfavorable payment and financial terms with PMC regarding the Recalled Devices."  Compl. ¶ 83.  Indeed, Plaintiffs' allegations that (1) PMC and DLL placed a credit hold on DHS and HOP, respectively, following DHS's default on payment obligations for purchased respiratory devices (*id.* ¶¶ 13, 74, 77, 81), that (2) non-party Res-Med placed "HOP on a hold from purchasing respiratory devices from ResMed because DLL froze HOP's financing" (*id.* ¶ 75); and that (3) DLL informed HOP that it "would not provide Respiratory Device Financing to HOP for any additional leases because of PMC's declaration of default against DHS" (*id.* ¶ 81), all allegedly resulted in DHS claiming that it was forced to "restructur[e] its lease agreements with PMC on terms beneficial to [Defendants]" (*id.).*

That Plaintiffs were unable to maintain 0% financing from PMC and DLL, and "force[d] into unfavorable payment and finance terms" after DHS defaulted on its loans is not antitrust injury.  *Id.* ¶ 83; *Atl. Richfield*, 495 U.S. at 334 (injury "will not qualify as antitrust injury unless

it is attributable to an anti-competitive aspect of the practice under scrutiny."); *Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d at 432 (citations omitted) ("Alleged harms that are causally related to Defendant's complained-of conduct, but are not alleged to have occurred as a result of lessened competition—do not qualify as antitrust injury."); *see also West Penn Allegheny*, 627 F.3d at 102-03 ("Because Highmark was just one of many possible sources of financing, we conclude that…Highmark's refinancing refusals could not have been "competition-reducing aspect[s]…of the" conspiracy… and thus did not give rise to an antitrust injury"); *Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998) (defendant's refusal to provide the plaintiff financing with which to open her own business did not give rise to antitrust injury because plaintiff could have obtained financing from many other sources); *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1173–74 (9th Cir. 1988) (defendant's refusal to sell plaintiff surplus milk did not give rise to antitrust injury where "there were 'plenty' of other sources for surplus milk").

    **B.**    **Absent Factual Allegations of Market-Wide Harm to Competition, Plaintiffs Cannot Plausibly Plead That It Suffered Antitrust Injury That Flowed from Defendants' Conduct.**

Plaintiffs' complaint leaps to the conclusion that because Plaintiffs were unable to obtain favorable financing terms from DLL and PMC, patients lost access to respiratory devices and were forced to pay supracompetitive interest rates and high prices for respiratory devices. *See, e.g.,* Compl. ¶ 88 ("Defendants' concerted refusal to deal with HOP is facially anticompetitive because it served no procompetitive benefit and only harmed competition for the supply of respiratory devices resulting in less access and supracompetitive prices and higher interest rates for respiratory devices in the U.S."); *id.* ¶¶ 14, 86-87, 94 (alleging that patients and insurance payers were "forced to pay supracompetitive interest rates and prices for respiratory devices

manufactured in the U.S."); *id.* ¶¶ 86, 94 (alleging that patients were not able to "access safe and effective respiratory devices").

However, there are no allegations that possibly tie PMC and DLL's alleged conduct— placing a credit hold on Plaintiffs' purchases of respiratory devices and not providing financing to Plaintiffs for additional leases of devices—to any market-wide harm. Plaintiffs make no attempt to allege with specificity how many suppliers provide patients with respiratory devices, how the elimination of 0% financing for Plaintiffs (only two suppliers who are part of the same corporate family) would affect patients' ability to access devices from other alternative suppliers, or how the change in Plaintiffs' ability to get financing from DLL and PMC would impact the interest rates offered to other suppliers.

Moreover, "[a]s a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market." *West Penn Allegheny*, 627 F.3d at 102. Thus, even if such market-wide harm was properly alleged—and it is not—Plaintiffs do not demonstrate how they seek damages for any such harm. *See Assoc. Gen. Contractors v. Carpenters*, 459 U.S. 519, 540-44 (1983); *Gregory Mktg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 95 (3d Cir. 1986) (where the plaintiff is neither a consumer nor a competitor in the at-issue market, they are not "within that area of the economy…endangered by [the] breakdown of competitive conditions") (citation omitted). Plaintiffs DHS and HOP are purchasers of respiratory devices, who then supply them to end-user patients. Compl. ¶¶ 5, 7. Then, DHS (and presumably HOP) receive monthly payments from patients or their insurance payors. *Id.* ¶ 47. So, the harm alleged relating to patient access or supracompetitive interest rates and higher respiratory device prices are not Plaintiffs' injuries, and Plaintiffs do not have standing to sue on behalf of those alleged injuries. *Assoc. Gen. Contractors*, 459 U.S. at 539.

C. **Plaintiffs' Alleged Injury Stems From A Breach Of Contract, Not Anticompetitive Conduct.**

Plaintiffs' inability to obtain specific financing terms or future financing leases from PMC and DLL is entirely due to DHS's breach of a contract.[4]  The complaint itself alleges that DHS stopped making payments to PMC for respiratory devices, regardless of whether those devices were part of the June 2021 recall.  Compl. ¶ 11 ("DHS was unable to make payments to PMC under the financing arrangements for the Recalled Devices."); *id.* ¶ 72 (describing attempts to reach resolution on payments to PMC for respiratory devices that excluded the Recalled Devices); *see also* supra n.1.  But, the PMC-DHS Master Lease Agreement ("MLA"), entered into by DHS and PMC and referenced in the Complaint (¶ 46), sets out that "Lessee's obligation to make the payments *shall be absolute and unconditional* and is not subject to any abatement, set-off, defense or counterclaim for any reason whatsoever, including, without limitation, any present or future claims against the Lessor or the provider of the equipment."[5]  Paragraph 13 further states that failure to make any payment when due will cause a default.  *Id.*  Accordingly, PMC's decision to declare DHS in default following DHS' failure to make payments on its lease, *see* Compl. ¶ 73, is not anticompetitive; it is permitted by their own agreement.  And lenders are permitted, consistent with competition, to enforce their contracts.  *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("[a]s a general rule, businesses are free to

---

[4] Again, the Parties are engaged in two other civil litigations related to the breach of the Master Lease Agreement ("MLA") and leases following the June 2021 recall of respiratory devices at issue in this Complaint.  *See supra*, note 1.

[5] While a district court ruling on a motion to dismiss generally may not consider matters extraneous to the pleadings, a well-known exception to this rule is that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted).  Here, Plaintiffs' Complaint references, and explicitly relies on, the MLA.  *See, e.g.*, Compl. ¶ 46 ("On December 14, 2015, DHS and PMC memorialized the arrangement by entering into a Master Lease Agreement ("MLA").  The MLA set forth… the process by which PMC and DHS would enter into subsequent purchase and payment schedules ("Leases") once DHS purchased the respiratory devices directly from Respironics."); *id.* ¶ 47 ("Pursuant to the MLA, DHS purchased respiratory devices directly from Respironics at pre-determined prices…").  The MLA is integral to Plaintiffs' claims against Respironics because, as alleged by Plaintiffs, it describes the financing arrangement underlying the alleged conspiracy between defendants to deny Plaintiffs' preferential terms.

choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing").

With respect to Plaintiffs' allegations relating to HOP and its respective credit hold, it is equally consistent with competition that DLL would consider DHS's payment activities in its dealing with HOP.  DHS acquired HOP and HOP is admittedly a wholly-owned, operated, *and controlled* affiliate of DHS.  Compl. ¶ 18 (emphasis added).  HOP is registered to do business as "Dynamic Healthcare Services PA" with the Pennsylvania Department of State.  *Id.*  HOP is also a durable medical device supplier and is the DHS affiliate entity that entered into financing agreements with DLL.  *Id.*; *see also id.* ¶ 51 ("DHS acquired HOP, a Respiratory Device Supplier, in 2012.  Since that time, DHS has operated HOP as a wholly-owned subsidiary that does business as 'Dynamic Healthcare Services PA.'").  Thus, a credit action against DHS is plausibly relevant to HOP, which operates under the control of DHS, and it is economically rational for a lender to factor in DHS's ability to meet its payment obligations when dealing with similar financing arrangements with HOP.  As with DHS, HOP's inability to obtain its preferred financing terms from DLL is not an injury that stems from anticompetitive conduct.  *Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d at 433 ("an antitrust injury must stem from a 'competition-reducing' aspect of the defendant's behavior") (citation omitted); *see also Host Int'l*, 32 F.4th at 250 ("An objectionable term in a commercial agreement, without more, is not an antitrust violation"); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (refusing to agree to a contract cannot state a plausible Section 1 injury because it is "axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors'").

II.     **PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE CONSPIRACY CLAIM.**

A.     **Plaintiffs Fail to Allege Sufficient Facts to Establish An Agreement.**

To survive a motion to dismiss when bringing a Section 1 conspiracy claim, a plaintiff

must provide enough facts to suggest that the defendants entered into an illegal agreement.

*Twombly*, 550 U.S. at 556 .  "The very essence of a claim alleging a contract in restraint of trade

under the Sherman Act is the existence of an agreement; *unilateral activity by a single person or

entity* will not suffice." *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550 (E.D. Pa.

2002) (emphasis added).  In particular, the plaintiff must plead "facts that are suggestive enough

to render a § 1 conspiracy plausible."  *Twombly*, 550 U.S. 544 at 556.  "[A]n allegation of

parallel conduct and a bare assertion of conspiracy," such as "a conclusory allegation of

agreement at some unidentified point," will not suffice.  *Id.*

Here, Plaintiffs allege in an entirely conclusory fashion that Defendants engaged in a

conspiracy "to cut off access to financing and leasing programs necessary for Respiratory Device

Suppliers in the U.S. to compete."  Compl. ¶ 14; *see also id.* ¶ 91 ("PMC, Respironics, and DLL

unlawfully conspired to restrain trade by agreeing that PMC and DLL would not enter into any

Respiratory Device Financing with DHS or HOP."); *id.* ¶ 78 ("In a concerted effort to force DHS

to make supracompetitive payments to PMC for Recalled Devices, Defendants conspired to

refuse to deal with DHS and HOP and to foreclose DHS and HOP from Respiratory Device

Financing and being able to purchase respiratory devices manufactured in the U.S."); *id.* ¶ 82

("On August 30, 2022, based on information it learned from DLL, Respironics, and PMC,

ResMed informed DHS that DLL would refuse to finance respiratory devices (sic) purchases by

DHS and HOP and that ResMed would place DHS and HOP on hold for all current and future

respiratory device purchases.").  These are conclusions, not facts.  Plaintiffs fail to allege *any

facts* to support that Defendants agreed to exclude DHS and/or HOP from any alleged relevant

market.  In particular, Plaintiffs fail to allege a specific time, place, or persons involved in any alleged conspiracy where the three Defendants agreed to deny DHS or HOP financing, what specific information was communicated, or even to what the parties agreed.

Moreover, to support an antitrust claim that *harms competition*, Plaintiffs would have to allege that Defendants not only "cut off access to financing and leasing programs" to Plaintiffs, but also to the much broader group of "Respiratory Device Suppliers in the U.S." *Id.* ¶ 14.  But the Complaint fails to do so.  The complaint on its face alleges over and over that only Plaintiffs lost their financing from Defendants' conduct.  *See, e.g., id.* ¶ 13 ("Without any justification, DLL then informed ResMed and HOP that it would no longer do business with HOP until DHS paid PMC for the recalled respiratory devices DHS had purchased from Respironics."); *id.* ¶ 74 ("DLL, without notice, placed HOP on a finance hold and told HOP that it would refuse to finance HOP's pending and future respiratory device purchases with ResMed."); *id* ¶ 77 (defendants "engaged in concerted conduct to foreclose DHS and HOP from being able to purchase respiratory devices in the U.S."); *id.* ¶ 78 ("Defendants conspired to refuse to deal with DHS and HOP and to foreclose DHS and HOP from Respiratory Device Financing and being able to purchase respiratory devices manufactured in the U.S."); *id.* ¶ 81 (DHS was forced "into restructuring its lease agreements with PMC on terms beneficial to PMC, Respironics, and DLL").

Plaintiffs' only attempt to allege harm to a broader set of suppliers is a single, conclusory allegation:  "Upon information and belief, DLL was orchestrating this scheme against other Respiratory Device Suppliers as well." *Id.* ¶ 85.  Plaintiffs fail to identify which Respiratory Device Suppliers were injured, in what manner, when, or any other facts to raise a plausible inference that any "scheme" affected the alleged Respiratory Device Suppliers market or

competition in that market more broadly.  In other words, Plaintiffs offer no factual allegations

that PMC or DLL refused to provide 0% financing to respiratory device suppliers other than

DHS or HOP.  Such allegations are insufficient to support an allegation of antitrust injury.  *See*

*Bassett v. NCAA*, No. 04–425, 2005 WL 3767016, at *4 (E.D. Ky. May 3, 2005) ("At best,

Basset alleges injury to himself as a competitor in the marketplace and not an injury to

competition in a relevant market.").

### B.    Plaintiffs Fail to Allege Sufficient Facts to Establish Any Participation by Respironics in an Alleged Agreement to Deny Plaintiffs Financing.

Plaintiffs must allege that "*each individual* defendant joined the conspiracy and played

some role in it" because, "at the heart of an antitrust conspiracy, is an agreement and a conscious

decision by each defendant to join it."  *In re Elec. Carbon Products Antitrust Litig.*, 333 F. Supp.

2d 303, 311 (D.N.J. 2004) (quoting *Jung v. Assoc. of American Medical Colleges*, 300 F. Supp.

2d 119, 163–64 (D.D.C. 2004)).  Simply using the global term "defendants" to apply to

numerous parties without any specific allegations that would tie each particular defendant to the

conspiracy is not sufficient.  *Id.* at 312.

To explain how Plaintiffs' allegations fail to support even an inference of Respironics'

involvement in an "agreement", it is helpful to preface with an overview of the relationships

between the respective parties *__as alleged by Plaintiffs__*:

- **Respironics** manufactures and sells respiratory devices to suppliers, like Plaintiffs **DHS** and **HOP**.  Compl. ¶¶ 39, 47.

- **PMC** – a joint venture between non-party **Philips North America LLC** and **DLL** – provides financing to Respironics' customers.  *Id.* ¶ 40.

- **PMC** and **DHS** entered into a lease agreement in December 2015 where **PMC** provided 0% interest financing.  *Id.* ¶¶ 45-46.

16

- **DHS** purchased respiratory devices from **Respironics**, and **Respironics** invoiced **DHS** for those respiratory devices. *Id.* ¶ 47.

- Within 90 days of receiving an invoice from Respironics, **DHS** financed the devices with **PMC** by grouping its device purchases from **Respironics** into a 12-month payment installment contract. *Id.*

- **DHS** and **PMC** followed this process for at least 50 leases. *Id.*

- Separately, **HOP** purchased respiratory devices from non-party ResMed. *Id.* ¶ 53  **HOP** financed its purchases through **DLL**. *Id.*

- After **Respironics** announced a recall in June 2021, **DHS** and **PMC** had discussions regarding restructuring the terms of the loans. *Id.* ¶ 70.

- On August 18, 2022, **PMC** informed **DHS** that it was in default on the leases, and on or around that date, **PMC** shared "commercially and competitively sensitive information about **DHS** with **DLL** and **ResMed**, respectively. *Id.* ¶ 73.

- On August 23, 2022, **DLL** without notice placed **HOP** on a finance hold and told **HOP** that it would refuse to finance HOP's pending and future respiratory device purchases with **ResMed**. *Id.* ¶ 74.  On the same date, **ResMed** placed **HOP** on a hold from purchasing respiratory devices because **DLL** froze HOP's financing. *Id.* ¶ 75.

- On August 25, 2022, **DLL** informed **HOP** that it would not provide financing to **HOP** for any additional leases because of **PMC**'s declaration of default against DHS. *Id.* ¶ 81.

- On August 30, 2022, **ResMed** informed **DHS** that **DLL** would refuse to finance respiratory devices purchased by DHS and HOP. *Id.* ¶ 82.

Aside from Respironics selling respiratory devices to DHS, Plaintiffs' allegations focus entirely on Defendants PMC and DLL's relationships with the Plaintiff device suppliers and their

ultimate decisions to freeze financing to Plaintiffs.  Nowhere does Plaintiff allege a "conscious decision" by Respironics to join in any such decision or any supporting facts.  *In re Elec. Carbon Products Antitrust Litig.*, 333 F. Supp. at 311; *see also Jung*, 300 F. Supp. 2d at 164 ("Although the Court must consider defendants' motions to dismiss in the context of the larger conspiracy…plaintiffs are not relieved from alleging that each individual defendant joined the conspiracy and played some role in it.").

The Complaint is also bereft of specific facts connecting Respironics to an agreement with PMC and DLL.  At most, Plaintiffs conclusorily allege that DLL's communications with DHS and HOP "expressly show that PMC and Respironics were sharing commercially and competitively sensitive information with their competitors." *Id.* ¶ 83.  These are not facts regarding Respironics or any alleged communications it had concerning Plaintiffs; these are unsupported assumptions that are insufficient to raise a plausible inference of an illegal conspiracy.  *Twombly*, 550 U.S. at 556-67 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

## III.   PLAINTIFFS' NONSENSICAL CLAIMS DO NOT WARRANT *PER SE* TREATMENT.

Even if Plaintiffs adequately pled antitrust injury – they do not – Plaintiffs' nonsensical conspiracy claim does not warrant *per se* treatment, as Plaintiffs suggest.  Compl. ¶ 15 (Defendants' conduct "is a naked concerted refusal to deal with a customer that should be deemed illegal *per se*.").[6]  *Per se* review is "the least rigorous of these standards" because it "eliminates the need to study the reasonableness of an individual restraint in light of the real

---

[6] "Concerted refusals to deal" and "group boycotts" are interchangeable terms to describe when two or more people or companies agree to not do business with another person or company.

market forces at work." *Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d at 429 (citing *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). *Per se* review is typically limited to cases involving horizontal agreements among direct competitors. *See, e.g., Bus. Elecs. Corp.*, 485 U.S. at 734; *Muko,* 670 F.2d at 429 ("Generally, the application of the *per se* rule has been limited to those 'classic' boycotts in which a group of business competitors seek to benefit economically by excluding other competitors from the marketplace."); *see also Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977) (*per se* rule is appropriate only in "relat[ion] to conduct that is manifestly anticompetitive").

But, Plaintiffs simply do not allege a horizontal agreement among direct competitors that would warrant *per se* treatment.[7]  Indeed, the parties alleged in this litigation span vertical relationships with Defendants as financiers (PMC and DLL) and a device manufacturer (Respironics or ResMed), and Plaintiffs as suppliers.  Thus, the alleged concerted refusal to deal with Plaintiffs and to foreclose them from financing should receive a rule of reason analysis. *See, e.g.*, *Bus. Elecs. Corp.,* 485 U.S. at 726 ("there is a presumption in favor of a rule-of-reason standard"); *Retina Assocs. v. S. Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376, 1381 (11th Cir. 1997) (applying rule of reason because "boycott alleged here is not of the type that has been historically shown to almost or almost always adversely affect competition"); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 853 F. Supp. 837, 840 (E.D. Pa. 1994) ("merely naming the practice a 'boycott'—and thus calling it a per se unlawful restraint—does not make it so"), *amended*, 857

---

[7] While the *per se* rule may alter the framework with which a court analyzes antitrust liability, it does not absolve an antitrust plaintiff from the threshold pleading obligation to allege antitrust injury. *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 341-42 (1990) ("The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages under § 4 of the Sherman Act."); *In re Cardizem CD Antitrust Litig*., 332 F.3d 896, 909 n.15 (6th Cir. 2003) ("Our conclusion that the Agreement was a *per se* illegal restraint of trade does not obviate the need to decide whether the plaintiffs adequately alleged antitrust injury."). Accordingly, even if the Court deems this implausible and ineffectual conspiracy to be worthy of *per se* treatment, Plaintiffs must still allege antitrust injury in a cognizable market.  They do not.  *See* Sections I and IV.

F. Supp. 455 (E.D. Pa. 1994), *aff'd* 107 F.3d 1026 (3d Cir. 1997).

Indeed, against the backdrop of a potential antitrust injury – which Plaintiffs fail to sufficiently plead (*see* Section I) – Respironics' participation in such an alleged agreement makes very little sense.  *See Twombly,* 550 U.S. at 567 (dismissing complaint because there was an "obvious alternative explanation" to defendants' behavior); *see also In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 327-28 (3d Cir. 2010) (dismissing conspiracy allegations because each insurer defendant had a legitimate reason to enter into contingent commission agreements).  For example, on the one hand, Plaintiffs allege that Respironics conspired "to cut off access to financing and leasing programs necessary for Respiratory Device Suppliers in the U.S. to compete" (Compl. ¶ 14), yet on the other hand "[g]iven the high cost associated with CPAP devices, Respiratory Device Suppliers often require financing to purchase the necessary inventory of respiratory devices to provide to OSA patients" (*id.* ¶ 8).  It is implausible that Respironics would benefit from any agreement that reduces suppliers' access to financing to purchase Respironics' devices.  This is particularly true when Plaintiffs allege that while Respironics was previously the "dominant manufacturer" of U.S. respiratory devices, following Respironics' series of recalls, non-party ResMed gained a market share in the alleged Respiratory Device Manufacturing Market of 62%.  Compl. ¶ 6.  Respironics' participation in a conspiracy that makes it *more difficult* for suppliers to purchase its devices, at the same time Respironics is ceding market share to a competitor, is illogical.

Of course, the "obvious alternative explanation" is that a decision to decline to finance DHS and HOP's purchases at 0% interest rates was the result of DHS' default on its lease with PMC.  *See* Section I.C.  Lenders are permitted to reassess financing terms and interest rates provided to specific parties, as permitted under their own contracts, following failure to pay by

the leasing party.  Thus, in the absence of alleged conduct warranting *per se* treatment, Plaintiffs'

claims must be analyzed under the rule of reason framework.  Under that analysis and as

discussed below, Plaintiffs' claim must fail because their allegations fail to demonstrate any

anticompetitive harm in the alleged relevant markets.

## IV.    PLAINTIFFS FAIL TO ALLEGE ANTICOMPETITIVE EFFECTS IN ANY RELEVANT MARKET IN WHICH RESPIRONICS PARTICIPATES.

Under rule of reason analysis, at the pleading stage, the plaintiff bears the initial burden

of demonstrating that an alleged restraint produced an adverse anticompetitive effect within the

relevant market.  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir. 2005); *see also Nat'l*

*Collegiate Athletic Ass'n*, 948 F. Supp. 2d at 430.

### A.    Respironics Does Not Compete In the Alleged Relevant Market Where Plaintiffs Claim Competition Was Restrained.

Plaintiffs allege three relevant antitrust markets in their complaint:  (1) a "U.S.

Respiratory Device Manufacturing Market" in which Respironics and non-party ResMed

participate as makers of respiratory devices (Compl. ¶¶ 6, 26); (2) a "U.S. Respiratory Device

Suppliers Market" in which Plaintiff DHS and HOP participate (*id.* ¶¶ 5, 35, 38); and (3) a "U.S.

Respiratory Device Financing Market" which allegedly includes PMC and DLL (*id.* ¶¶ 30-31).

But, the complaint only alleges anticompetitive effects in one.

Respiratory Device Manufacturing Market:  Plaintiffs' complaint does not contain a

single allegation that shows a restraint on the Respiratory Device Manufacturing Market.

Instead, Plaintiffs' allegations highlight that non-party ResMed—the only other Respiratory

Device Manufacturer mentioned by name throughout the entire complaint—gained a "lead

position in the respiratory devices market" when Respironics' recalled its devices (*id.* ¶ 82) and

now has a market share of approximately 62% (*id.* ¶ 6).

Respiratory Device Suppliers Market:  Plaintiffs' complaint also does not contain a single allegation that shows a restraint on the Respiratory Device Suppliers Market.  Plaintiffs' allegations note that Plaintiffs DHS and HOP are respiratory device suppliers and that there are "similar suppliers" who purchase devices from manufacturers (i*d.* ¶ 7), but does not make any attempt to indicate that there was any anticompetitive effect on this market by way of reduced quality or quantity of suppliers.

Respiratory Device Financing Market:  All of the anticompetitive effects alleged in the complaint appear to occur in the Respiratory Device Financing Market.  For example, Plaintiffs allege that "Defendants are engaged in an ongoing conspiracy, in violation of Section 1 of the Sherman Act, *to cut off access to financing and leasing programs* necessary for Respiratory Device Suppliers in the U.S. to compete."  Compl. ¶ 14 (emphasis added).  Plaintiffs further allege that "DLL and PMC are the dominant providers of *financing and leasing* programs to Respiratory Device Suppliers in the U.S.  DLL and PMC used their affiliation, market power and exclusivity agreements with Respiratory Device Manufacturers to offer zero percent (0%) interest financing."  *Id.* (emphasis added).  And, Plaintiffs claim that Defendants' alleged "anticompetitive scheme" "foreclose[d] competition from *other lenders and* Respiratory Device Manufacturers and raise[d] prices for patients in the U.S."  *Id.* (emphasis added); *see also id.* ¶ 74 (alleging DLL's placement of HOP on a finance hold and refusal to finance HOP's pending and future respiratory device purchases); ¶ 78 ("Defendants conspired to refuse to deal with DHS and HOP and to foreclose DHS and HOP from Respiratory Device Financing"); ¶ 83 ("force DHS into unfavorable payment and finance terms with PMC regarding the Recalled Devices"); ¶ 84 ("DLL is able to leverage its dominant position in the Respiratory Device Financing market to force Respiratory Devices Suppliers to make supracompetitive payments – e.g., DHS being

forced into unfavorable payment and finance terms with PMC").

But with respect to device financing, Respironics is *not* a direct participant as a supplier of lending services, so it is unclear how any actions by Respironics would be relevant to restraining competition in that market.  Compl. ¶ 19 ("Respironics is the manufacturer of respiratory devices").  While Plaintiffs allege that "PMC, Philips, and Respironics entered into a Third Amendment to the Operating Agreement…which expanded the term 'Philips Medical Division' to include Respironics and all Respironics subsidiaries, *id.* ¶ 44, this agreement merely resulted in PMC providing financing for Respironics products; it did not make Respironics a decisionmaker with respect to financing.  And, similarly, while Plaintiffs allege that "Respiratory Device Financiers enter into joint ventures and/or exclusivity arrangements with U.S. Respiratory Device Manufacturers to foreclose competition from other lenders," (i*d.* ¶ 31), indirect participation does not suggest, and Plaintiffs do not specifically allege, that Respironics *itself* provides financing for its products or otherwise competes with Defendants PMC and DLL. It is therefore implausible that any "refusal to deal" involved competing *lenders* conspiring to exclude other competitors.

### B.    Plaintiffs Fail to Properly Allege Foreclosure In the Respiratory Device Financing Market.

Even if Respironics somehow competed in the alleged Respiratory Device Financing Market, Plaintiffs' allegations of foreclosure are entirely conclusory and collapse upon scrutiny.

Plaintiffs' allegation that Respiratory Device Financing lenders "have teamed up with Respiratory Device Manufacturers, including Respironics, to offer lending terms to Respiratory Device Suppliers under which no other lenders can compete" lacks factual support and economic rationale.  *Id.* ¶ 31.  PMC's and DLL's refusal to extend financing did not foreclose DHS and HOP from obtaining financing from other third-party lenders.  If other lenders could not compete

with a 0% interest rate, that by itself would not render PMC or DLL's financing anticompetitive, and Plaintiffs do not explain how Defendants' financing arrangements "foreclose competition from other lenders" who are free to offer the same terms.  *Id.* ¶¶ 14, 31.  Ultimately, as Plaintiffs allege, DHS agreed to pay higher prices for the devices in order to obtain 0% financing, *id.* ¶ 45, and DHS is free to seek other financing arrangements at another mix of payment terms.

While Plaintiffs claim that Respiratory Device Suppliers "cannot reasonably turn to lenders unaffiliated with Respiratory Device Manufacturers due to the material difference in interest rates offered by U.S. Respiratory Device Financiers," *id.* ¶ 32, this is simply Plaintiffs' preference on terms, not actual foreclosure from other lenders.  It does not logically follow that by refusing to provide 0% financing to DHS or HOP, PMC and DLL "foreclose[d] competition from *other* lenders."  *Id.* ¶ 14 (emphasis added).  Rather, if PMC and DLL refused to provide 0% financing, other lenders could step in to do so.  For example, Plaintiffs allege that ResMed, who HOP purchased respiratory devices from, "offered Respiratory Device Financing to HOP" not only through DLL, but also Wells Fargo.  *Id.* ¶ 53.  Plaintiffs allege only that DHS and HOP could not obtain 0% financing from PMC or DLL.  *Id.* ¶¶ 78, 83-84.  Plaintiffs in fact seem to concede that DHS was able to obtain financing from PMC, but at less favorable terms than prior to their default.  *Id.* ¶ 83 (alleging PMC and Respironics "force[d] DHS into unfavorable payment and finance terms with PMC regarding the Recalled Devices").

Moreover, the complaint details only DHS and HOP's financing arrangements, not those of other Respiratory Device Suppliers.  Plaintiffs provide no factual allegations supporting that PMC and DLL "cut off access to financing and leasing programs" to all *suppliers*, or that they refused to provide zero percent financing to all suppliers.  *Id.* ¶ 14.  *See Host Int'l*, 32 F.4th at 251 ("[d]espite references of potential harm to others, …Host seeks remedy for its injury alone,

and that injury is its exclusion from PHL…But, once again, pleading an antitrust injury requires a plaintiff to prove that [the] challenged conduct affected the prices, quantity or quality of goods or services, not just [its] own welfare) (citations and quotations omitted).  Plaintiffs' only allegations are that PMC cut off financing to DHS (and subsequently, DLL to HOP) based on DHS' payment default.  *Id.* ¶¶ 73-75.  In short, there are no factual allegations that PMC and DLL took any actions with respect to other suppliers.

Finally, it is not plausible or economically rational that Respironics would seek to "cut off access" to financing respiratory devices when financing is necessary for some customers to purchase Respironics devices.  But under Plaintiffs' theory, Respironics conspired to prevent *its own customers* from purchasing Respironics-manufactured devices.  That theory is non-sensical and further exemplifies how Plaintiffs' antitrust claims against Respironics fail.

## **CONCLUSION**

For each of the foregoing reasons, Plaintiffs' Complaint should be dismissed.


Dated: October 11, 2024

/s/ John K. Gisleson
John K. Gisleson (PA62511)
MORGAN, LEWIS & BOCKIUS LLP
One Oxford Centre
Third-Second Floor
Pittsburgh, PA  15219-6401
412-560-3300 (telephone)
412-560-7001 (facsimile)
john.gisleson@morganlewis.com

Elisa McEnroe (PA206143)
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103
215-963-5000 (telephone)
215-963-5001 (facsimile)
elisa.mcenroe@morganlewis.com

*Counsel for Defendant Respironics*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 11, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system for electronic service on all counsel of record.

*/s/ John K. Gisleson*
John K. Gisleson
