**DUANE MORRIS LLP**
Sarah O'Laughlin Kulik (318534)
Bryan N. Shapiro (329241)
30 South 17th Street
Philadelphia, PA 19103-4196
T: (215) 979-1000
e: Sckulik@duanemorris.com
BShapiro@duanemorris.com

C. Neil Gray (*pro hac vice*)
Duane Morris LLP
335 Madison Avenue
New York, NY 10017
T: (212) 692-1000
e: CNGray@duanemorris.com

*Attorneys for Plaintiffs Dynamic Healthcare Services, Inc. and Hometown Oxygen, Pittsburgh LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DYNAMIC HEALTHCARE SERVICES, INC., and HOMETOWN OXYGEN, PITTSBURGH LLC,**<br><br>Plaintiffs,<br><br>v.<br><br>**DE LAGE LANDEN FINANCIAL SERVICES, INC., PHILIPS RS NORTH AMERICA, LLC f/k/a RESPIRONICS, INC. and PHILIPS MEDICAL CAPITAL, LLC,**<br><br>Defendants. | Case No. 24-3058<br><br>**JURY TRIAL DEMANDED** |

# AMENDED COMPLAINT

Plaintiffs, Dynamic Healthcare Services, Inc. ("DHS") and Hometown Oxygen, Pittsburgh LLC ("HOP" and collectively with DHS, the "Plaintiffs"), by and through their

counsel, Duane Morris LLP, hereby file this Complaint against Defendants Philips RS North America, LLC f/k/a Respironics, Inc. ("Respironics"), De Lage Landen Financial Services, Inc. ("DLL") and Philips Medical Capital, LLC ("PMC") (collectively, the "Defendants"), and aver as follows:

## I. INTRODUCTION

1. This case challenges an unlawful conspiracy among the dominant providers of respiratory device financing to deny Plaintiffs—and similarly situated respiratory device suppliers—access to the financing necessary to compete in the U.S. market. When Plaintiffs' dispute with one financing entity arose from a massive product recall of defective devices manufactured by Defendant Respironics, Defendants weaponized their interlocking market positions to coerce payment for those defective devices by cutting off Plaintiffs' access to all preferred financing channels. Defendants also shared confidential customer information among horizontal competitors, coordinated a refusal to deal, and leveraged their collective market dominance to foreclose Plaintiffs from competition., These actions, whether viewed individually or collectively, and whether subjected to per se scrutiny or the rule of reason, ultimately caused multiple market harms, including raising prices on respiratory device suppliers and end-user patients.

2. Tens of millions of Americans live with obstructive sleep apnea ("OSA"), a serious health condition involving snoring and interrupted breathing during sleep. Untreated, OSA can have serious health implications, including increased risk of cardiovascular disease, stroke, metabolic disease, excessive daytime sleepiness, workplace errors, traffic accidents, and death.

3. The first-line treatment for OSA is a continuous positive airway pressure (CPAP) device. A CPAP is a respiratory device that pressurizes air and delivers it through a hose and

mask into the airway during sleep. The steady flow of air keeps the airway open, improving respiration and sleep quality.

4. Research shows that CPAP therapy may improve cardiovascular health, lower stroke risk, lower daytime sleepiness, and improve the mental health of people with OSA.

5. In the United States, CPAP devices cost between $500 and $1,000 on average[1] for OSA patients without insurance. Many OSA patients use insurance to pay for some or all of the cost of a CPAP device.

6. Plaintiffs are respiratory device suppliers. OSA patients, their insurers, or some combination thereof, pay companies like Plaintiffs to help OSA patients select and purchase the correct CPAP device, develop the right treatment program, educate OSA patients on the treatment program, and monitor the patient's progress. Respiratory device suppliers like Plaintiffs also help OSA patients achieve an improved health outcome from their respiratory device therapy by developing clinical programs, educating and monitoring patients, and supplying safe and effective respiratory devices.

7. Defendant Respironics and non-party ResMed Inc. ("ResMed") are respiratory device manufacturers. Until a series of FDA recalls of respiratory devices manufactured by Respironics, Respironics was the largest manufacturer of respiratory devices in the U.S. Today, ResMed is the largest manufacturer of respiratory devices in the U.S. with a market share of approximately 50-60%.[2]

[1] *See* https://www.sleepfoundation.org/cpap/how-much-do-cpap-machines-cost (last accessed March 26, 2026)

[2] *See https://www.lifesciencemarketresearch.com/insights/sleep-apnea-market-innovation-and-growth-in-2025#:~:text=ResMed's%20Dominance%20and%20Strategy%20for,its%20position%20in%20the%20market.* (Last accessed March 27, 2026)

8. Plaintiffs and similar suppliers ("Respiratory Device Suppliers") purchase respiratory devices from Respironics, ResMed, and similar manufacturers ("Respiratory Device Manufacturers") and supply them to end-user patients who have a prescription.

9. Given the high cost associated with CPAP devices, Respiratory Device Suppliers need financing to acquire inventory that is then (re)sold or provided to OSA patients ("Respiratory Device Financing").

10. Defendant, DLL, is the leading financier of respiratory devices in the U.S., holding an approximate 30% market share.

11. PMC is a joint venture between DLL and Respironics' parent company, Philips North America LLC f/k/a Philips Electronics North America Corporation ("Philips"), and is the exclusive financier of respiratory devices manufactured by Respironics in the U.S. Upon information and belief, PMC controls the majority of the preferred financing market for Respironics respiratory devices. Prior to the Respironics recall, when Respironics held the dominant position in the Respiratory Device Manufacturing market, PMC's arrangement gave it substantial market power in the overall Respiratory Device Financing market.

12. Prior to the Respironics recall, DHS purchased thousands of respiratory devices and related equipment from Respironics. DHS financed those purchases through PMC. After the recall, DHS had an inventory of unsafe, recalled respiratory devices (the "Recalled Devices") that it could not supply to OSA patients. Unable to monetize its inventory of Recalled Devices, DHS was unable to make payments to PMC under the financing arrangements for the Recalled Devices.

13. Similarly, prior to the Respironics recall, HOP purchased thousands of respiratory devices and related equipment from ResMed. HOP financed those purchases through DLL.

However, since no ResMed respiratory devices were involved in the Respironics recall, HOP has continued to sell ResMed respiratory devices and satisfy its financial obligations to DLL.

14. In August 2022, following Respironics' major recall announcement, PMC declared DHS in default in relation to the Respironics agreements. Within days of that declaration, and pursuant to a coordinated plan, PMC and Respironics shared confidential, commercially sensitive information about DHS—including DHS's default status, outstanding payment obligations, and credit history—with DLL. This information was shared through communications involving Respironics employee Rob Schade, who served as PMC's primary contact with DHS and acted as a conduit between PMC, Respironics, and DLL. Without any independent justification related to HOP's separate financing relationship, DLL then informed not only Plaintiffs *but also ResMed* that it would no longer do business with Plaintiffs until DHS paid PMC for the Recalled Devices DHS had purchased from Respironics. As a result of this inappropriate sharing of confidential and commercially sensitive information, Defendants diminished Plaintiffs' relationship with ResMed causing other Respiratory Device Suppliers to gain an unwarranted commercial edge in the market.

15. Defendants are engaged in an ongoing conspiracy, in violation of Section 1 of the Sherman Act, to cut off access to financing and leasing programs necessary for Respiratory Device Suppliers in the U.S. to compete, thereby raising costs for suppliers and ultimately increasing prices paid by OSA patients and their insurers for respiratory devices. Defendants are not doing this for any competitive reason or pro-competitive justification. Together, DLL and PMC are the dominant providers of financing and leasing programs to Respiratory Device Suppliers in the U.S. DLL and PMC used their affiliation, combined market power, and exclusivity agreements with Respiratory Device Manufacturers to offer zero percent (0%)

interest financing to certain suppliers that they wished to preference in the market and to punish other suppliers who did not comply with their demands.

16. Defendants further shared commercially sensitive information about their customers as part of an anticompetitive scheme to foreclose competition from other lenders and Respiratory Device Manufacturers, restrict the number of Respiratory Device Suppliers able to compete, and raise prices for patients in the U.S.

17. Defendants' scheme is facially anticompetitive and thus should be deemed illegal *per se*. Even if this scheme is not facially *per se* illegal, the anticompetitive effects vastly outweigh any benefits and should be swiftly condemned under the rule of reason.

18. Defendants' conspiracy constitutes a per se violation of Section 1 of the Sherman Act because: (i) Defendants collectively possess significant market power in the Respiratory Device Financing market; (ii) Defendants' coordinated refusal to deal denied Plaintiffs access to zero-percent financing—a critical input that Plaintiffs and similarly situated suppliers require to compete effectively; and (iii) the boycott served no legitimate business purpose but was designed solely to coerce payment for defective, recalled devices. Even if the per se rule does not apply, Defendants' conduct is unlawful under the rule of reason because (a) Defendants possess substantial market power, (b) the conspiracy caused significant anticompetitive effects including higher prices, reduced output, and foreclosure of competition, and (c) Defendants have no cognizable procompetitive justification for their conduct.

19. Plaintiffs bring this suit against Defendants to recover all damages and obtain injunctive relief available under federal antitrust law.

## II. THE PARTIES

### A. Plaintiffs

20. Plaintiff DHS is a durable medical device supplier. DHS is a Pennsylvania corporation with its principal place of business located at 777 East Park Drive, Suite 210 Harrisburg, Pennsylvania 17111.

21. Plaintiff HOP is a Pennsylvania corporation with its principal place of business located at 777 East Park Drive, Suite 210 Harrisburg, Pennsylvania 17111. On November 14, 2012, DHS acquired HOP and HOP has been since that time a wholly owned, operated, and controlled affiliate of DHS and is registered to do business as "Dynamic Healthcare Services PA" with the Pennsylvania Department of State. HOP is also a durable medical device supplier and is the DHS affiliate entity that entered into financing agreements with DLL.

### B. Defendants

22. Defendant Respironics is a Delaware corporation with its principal place of business located at 6501 Living Place, Pittsburgh, Pennsylvania 15296. Respironics is the manufacturer of respiratory devices that are the subject of three separate recalls that have occurred over the past two-plus years. The first recall occurred in June 2021, and resulted from Respironics using an extremely hazardous material in its respiratory devices.

23. Upon information and belief, Defendant DLL is a Michigan corporation authorized to do, and doing, business in the Commonwealth of Pennsylvania at all times material hereto. DLL is a specialist in financing and leasing medical equipment and operates at 1111 Old Eagle School Road, Wayne, PA 19087.

24. Defendant PMC is a Delaware limited liability company that conducts business in the Commonwealth of Pennsylvania and has a principal place of business at 1111 Old Eagle School Road, Wayne, PA 19087.

25. PMC is a joint venture between Philips and DLL that provides Respiratory Device Financing only to Respironics' customers. DLL and Philips entered into a Limited Liability Company Agreement, dated August 16, 2002, to form PMC, a limited liability company. DLL and Philips are PMC's Members. DLL holds a 60% controlling interest in PMC, and Philips holds the other 40%.

26. Upon information and belief, PMC operates independently and separately from DLL for purposes of day-to-day business operations. Specifically, PMC is run by an independent set of directors and officers; PMC and DLL do not share a single center of decision making; and PMC and DLL do not maintain a single aggregation of economic power. This operational independence is critical to establishing that PMC and DLL are capable of conspiring with each other under Section 1 of the Sherman Act.

27. PMC and Philips—the latter acting through a division doing business as Philips Medical Systems North America Company—entered into an Operating Agreement, dated August 16, 2002, governing the leasing and financing of products offered for sale by the Philips Medical Division (the "Operating Agreement").

28. Philips Medical Division consists of different Philips entities that sell various Philips products that are financed by PMC pursuant to the Operating Agreement.

29. PMC, Philips, and Respironics entered into a Third Amendment to the Operating Agreement (the "Third Amendment"), dated September 16, 2009, which expanded the term "Philips Medical Division" to include Respironics and all Respironics subsidiaries. Consistent with the Third Amendment, PMC would provide financing for the purchase of Respironics devices and equipment.

## III. JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises out of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26.

31. This Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and Pennsylvania's long-arm statute, 42 Pa.C.S.A. § 5322.

32. Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants maintain business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## IV. FACTUAL ALLEGATIONS

### A. The U.S. Respiratory Device Manufacturing Market Is A Relevant Product and Geographic Market.

33. The sleep industry recognizes respiratory devices as a relevant product market. Respiratory devices are used to assist breathing and are intended to help patients in need of support for breathing, removal of carbon dioxide, and therapy to reduce disuse atrophy of abdominal wall muscles. Certain types of respiratory devices can also constitute relevant antitrust submarkets based on the particular needs and diagnoses of certain patients, including continuous ventilators, Bilevel Positive Airway Pressure (BiPAP) devices, and CPAP devices. Respiratory devices are not interchangeable with other treatments for OSA, such as mouth exercises and changes to a patient's diet.

34. A patient seeking reimbursement for a respiratory device must meet certain requirements. Physicians prescribe respiratory devices because of their particular characteristics and uses when other treatments would not be sufficiently effective. Insurance payors only cover respiratory devices for patients whose doctor and Respiratory Device Supplier are enrolled in the insurance payor's network. Medicare will only cover respiratory devices that are prescribed by doctors and supplied by Respiratory Device Suppliers that are enrolled in Medicare.

35. The relevant geographic market for respiratory devices is no broader than the U.S. Respiratory devices sold in the U.S. and that are regulated by the U.S. Food and Drug Administration (the "FDA"). Respiratory Device Manufacturers in the U.S. must have an established and strong reputation among U.S. customers for producing high-quality respiratory devices to compete effectively. Because of these and the foregoing considerations, the options for U.S. customers are limited to manufacturers with a U.S. presence and strong reputations in the U.S.

**B. The U.S. Respiratory Device Financing Market Is a Relevant Product and Geographic Market.**

36. Lenders providing Respiratory Device Financing in the U.S., including DLL and PMC, have teamed up with Respiratory Device Manufacturers, including Respironics, to offer lending terms to Respiratory Device Suppliers under which no other lenders can compete ("Respiratory Device Financiers"). Respiratory Device Financiers enter into joint ventures and/or exclusivity arrangements with U.S. Respiratory Device Manufacturers to foreclose competition from other lenders. For example, Respiratory Device Financiers commonly offer interest free Respiratory Device Financing to Respiratory Device Suppliers in the U.S., whereas other lenders—i.e., lenders that do not have exclusivity arrangements—cannot make such an offer and must offer financing based on current market conditions.

37. Respiratory Device Suppliers in the U.S. cannot reasonably turn to lenders unaffiliated with Respiratory Device Manufacturers due to the material difference in interest rates offered by U.S. Respiratory Device Financiers. Lenders unaffiliated with U.S. Respiratory Device Manufacturers must set interest rates according to economic indicators and other factors—providing interest rates as high as 10%—whereas U.S. Respiratory Device Financiers can use their arrangements with U.S. Respiratory Device Manufacturers to set the interest rate at zero.

38. DLL, PMC, and other Respiratory Device Financiers recognize this relevant market in their publicly available regulatory filings and marketing materials. Indeed, DLL touts its leading and dominant market position of over 30% in this market.[3]

39. Importantly, once a Respiratory Device Manufacturer assigns a Respiratory Device Supplier to a Respiratory Device Financier, such as DLL, the Respiratory Device Supplier becomes subject to an exclusivity arrangement. If a Respiratory Device Financier, such as DLL, forecloses financing, the Respiratory Device Supplier is prohibited from obtaining financing through an alternative preferred partner, resulting in substantially higher interest rates from third-party financiers who cannot match the rates offered by the exclusive partners.

40. Preferred financing partners therefore exercise dominant control over the market for Respiratory Device Financing, as Respiratory Device Suppliers are effectively locked into these arrangements and compelled to comply with the terms imposed by the designated financiers or face significantly higher financing costs, harming the overall competitive marketplace for Respiratory Device Suppliers. This structure suppresses competition in

[3] *See, e.g., https://www.dllgroup.com/en/-/media/Project/Dll/Global/Documents/Annual-Reports/2024/DLL-Annual-Report-2024.pdf* (last accessed March 26, 2026)

Respiratory Device Financing and allows Defendants to control which suppliers can remain competitive.

41. The relevant geographic market for Respiratory Device Financing is no broader than the U.S. Respiratory devices sold in the U.S. are regulated by the FDA, and Respiratory Device Financiers must enter into joint ventures or other arrangements with U.S. Respiratory Device Manufacturers to compete in this market. Because of these and the foregoing considerations, the options for U.S. customers and Respiratory Device Suppliers are limited to Respiratory Device Financiers with a U.S. presence and strong reputations in the U.S.

**C. The U.S. Respiratory Device Suppliers Market Is A Relevant Antitrust Market.**

42. One of the relevant antitrust markets, to the extent one must be defined, to analyze the anticompetitive effects of Defendants' scheme is no broader than Respiratory Device Suppliers in the U.S.

43. Respiratory Device Suppliers must have U.S. sales representatives and support capabilities to provide their OSA patients with assistance, education, and monitoring. Sales representatives also typically visit physicians to demonstrate products, provide educational materials, and develop relationships that are important to driving sales of respiratory devices. To compete effectively, Respiratory Device Suppliers must also have an established and strong reputation among U.S. customers for supplying high-quality respiratory devices. Because of these considerations, the options for U.S. customers are limited to Respiratory Device Suppliers with a U.S. presence.

44. The relevant geographic market for U.S. Respiratory Device Suppliers is no broader than the U.S. To meet patient demand, U.S. Respiratory Device Suppliers must keep

hundreds of respiratory devices in inventory for quick delivery to patients in the U.S. Respiratory Suppliers without a U.S. presence cannot effectively compete for U.S. patients.

**D. Plaintiffs' Respiratory Device Purchases and The Respironics Recall**

45. Plaintiffs are Respiratory Device Suppliers. They purchase respiratory devices from Respiratory Device Manufacturers using Respiratory Device Financing and then lease respiratory devices to OSA patients as part of a clinical program that includes training, education, and monitoring of OSA patients.

46. Respironics manufactures and sells respiratory devices and sells them to Respiratory Device Suppliers and other customers.

47. Beginning in 2015, DHS sought an arrangement with Respironics to purchase certain respiratory devices. Respironics informed DHS that PMC could provide financing to DHS at 0% interest in exchange for DHS paying Respironics a higher than market purchase price per Respiratory Device.

48. On December 14, 2015, DHS and PMC memorialized the arrangement by entering into a Master Lease Agreement ("MLA"). The MLA set forth, among other things, the process by which PMC and DHS would enter into subsequent purchase and payment schedules ("Leases") once DHS purchased the respiratory devices directly from Respironics.

49. Pursuant to the MLA, DHS purchased respiratory devices and supplies directly from Respironics at pre-determined prices, and Respironics invoiced DHS for the respiratory devices it purchased. Respironics shipped the respiratory devices and supplies that DHS purchased directly to DHS or to a third party designated by DHS. Within 90 days after receiving each invoice from Respironics, DHS financed the respiratory devices purchased from Respironics with PMC by grouping all respiratory device purchases from Respironics into a 12-month payment installment contract. DHS then supplied the respiratory devices to its patient

customers, and DHS patients, or their insurance payors, made monthly payments to DHS. DHS and PMC followed this process for at least 50 leases, until the Respironics recall.

50. DHS secured each lease with PMC with the corresponding respiratory devices that DHS purchased from Respironics.

51. Prior to the Respironics recalls, Respironics was the dominant Respiratory Device Manufacturer in the U.S. and PMC was the provider of Respiratory Device Financing authorized to do business with Respironics.

52. From December 2015 until the middle of 2021, Respironics sold respiratory devices to DHS, PMC financed each of those purchases, and DHS complied with PMC's financing terms.

53. DHS acquired HOP, a Respiratory Device Supplier, in 2012. Since that time, DHS has operated HOP as a wholly-owned subsidiary that does business as "Dynamic Healthcare Services PA."

54. HOP contracts with Respiratory Device Manufacturers for the purchase of respiratory devices and leases the respiratory devices to its customers. HOP, like other Respiratory Device Suppliers, needs Respiratory Device Financing in order to purchase sufficient respiratory devices to operate its Respiratory Device Supplier business.

55. HOP entered into an arrangement with ResMed to purchase respiratory devices. ResMed offered Respiratory Device Financing to HOP through one of its two exclusive providers of Respiratory Device Financing, DLL and Wells Fargo. HOP was assigned to DLL for purposes of obtaining Respiratory Device Financing. ResMed worked with HOP and DLL to secure Respiratory Device Financing for HOP. DLL agreed to finance HOP's purchases of

ResMed respiratory devices at 0% interest rates in exchange for certain benefits sent back to DLL from ResMed.

56. Pursuant to the arrangement, HOP purchased ResMed respiratory devices directly from ResMed, and ResMed invoiced HOP for those purchases. ResMed shipped the respiratory devices HOP purchased directly to HOP or to one of HOP's designated third parties. Within 90 days after receiving each invoice from ResMed, HOP financed its ResMed purchases with DLL by grouping its purchases into 12-month payment installment contracts. HOP supplied the respiratory devices to its customers, and HOP's customers, or their insurance payors, made monthly payments to HOP.

57. HOP secured each lease with DLL with the corresponding equipment that HOP purchased from ResMed.

58. HOP's relationship with DLL was memorialized through various finance agreements.

59. On April 26, 2021, Respironics disclosed publicly, for the first time, that certain respiratory devices that it had been manufacturing and selling in the U.S. posed health risks to OSA patients.

60. On June 14, 2021, Respironics announced that it was recalling several models of respiratory devices "to address identified potential health risks" related to those respiratory devices manufactured and sold in the U.S., including hundreds of Recalled Devices that DHS had purchased from Respironics and financed through PMC.

61. Respironics stated that continued use of the Recalled Devices by OSA patients was associated with numerous potential health conditions, including "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and

carcinogenic effects." Respironics' announcement to physicians treating OSA patients advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."

62. In June 2021, Respironics admitted that the Recalled Devices were defective and unsafe. Respironics instructed DHS to refrain from leasing and/or otherwise supplying the Recalled Devices to DHS' customers. Respironics also instructed DHS to notify DHS' customers about the Recalled Devices and to instruct customers to refrain from using any of the Recalled Devices in their possession. DHS' current inventory includes approximately 1,000 Recalled Devices.

63. On July 22, 2021, the FDA confirmed the severity of the issues associated with the Recalled Devices and classified the recall as Class I—"the most serious type of recall"—meaning use of the Recalled Devices may cause serious injuries or death.

64. When Respironics first announced the recall on June 14, 2021 and for many months thereafter, Respironics did not offer any of its Respiratory Device Suppliers, including DHS, any options regarding remediation of the Recalled Devices or exchange of the Recalled Devices for safe respiratory devices.

65. On September 1, 2021, Respironics received authorization from the FDA to begin a remediation process for certain Recalled Devices in the U.S. At the time, Respironics estimated that it would take one year to complete the remediation program.

66. Respironics announced a remediation program for patients that had been leasing certain Recalled Devices. Respironics' remediation program, to date, has failed to adequately remediate all Recalled Devices in Respiratory Device Suppliers' possession and/or adequately

compensate Respiratory Device Suppliers for the Recalled Devices that they purchased and can no longer provide to OSA patients.

67. Since the June 2021 recall of respiratory devices manufactured by Respironics, Respironics has announced two additional recalls related to its respiratory devices.

68. For many years prior to 2021, Respironics knew that some of its respiratory devices could seriously harm OSA patients using those respiratory devices. On November 9, 2021, the FDA issued a report of its investigation in which it concluded that Respironics knew, beginning in at least 2008, of the issues and that Respironics had received hundreds of thousands of customer complaints regarding issues with the Recalled Devices, yet it never informed its Respiratory Device Suppliers, patients, physicians, or the general public.

69. According to the FDA's findings, Respironics was well aware of the serious health risks posed by the Recalled Devices prior to the time DHS began purchasing the Recalled Devices and entering into the Respiratory Device Financing arrangement with PMC for those purchases. In connection with its investigation, the FDA determined that the Recalled Devices failed to comply with "current good manufacturing practice" requirements ("CGMPs") codified in FDA regulations. Under 21 U.S.C § 351(h), devices that are not manufactured in compliance with the FDA's CGMPs "shall be deemed adulterated." Accordingly, the Recalled Devices were adulterated and should have been prohibited for sale, delivery, or receipt.

70. Immediately after Respironics' recall announcement in June 2021, DHS instructed its customers to cease using the Recalled Devices. As a result, DHS's customers stopped making monthly lease payments to DHS for the Recalled Devices and DHS was left with, and still possesses, nearly 1,000 Recalled Devices in its inventory that it cannot provide to patients. Despite the fact that Respironics had failed to initiate a sufficient remediation plan to

assist DHS, and other Respiratory Device Suppliers, in exchanging the Recalled Devices for safe and effective respiratory devices, PMC continued to demand payment for the Recalled Devices under open finance agreements with DHS.

71. Specifically, DHS and PMC had ten open finance agreements that covered Recalled Devices ("Leases 41-50").

**E. Defendants' Concerted Refusal to Deal**

72. Immediately following the Respironics Recall, in June 2021, DHS, PMC, and Respironics began discussing a restructured payment plan to determine how payment for the respiratory devices would continue and how to separate the affected and non-affected equipment covered in Leases 41-50.

73. Initially, PMC and Respironics offered DHS payment deferrals on Leases 41-50, which would extend until such time as and the parties reached a restructured payment plan for both Recalled Devices and other respiratory devices purchased by DHS from Respironics and financed through PMC.

74. Most of the conversations between Respironics, PMC, and DHS involving the plan to re-structure the payments under Leases 41-50 occurred through phone calls between DHS and Respironics' Financial Solutions Specialist Rob Schade ("Mr. Schade"), who was, at all relevant times, the primary connection between DHS and PMC.

75. Respironics was directly engaged in these negotiations through Mr. Schade, a Respironics employee, who had authority to act on behalf of PMC by way of Respironics' and PMC's business relationship.

76. In July 2022, PMC, Respironics, and DHS appeared close to reaching a final resolution on the restructure whereby DHS would make payments to PMC under Leases 41-50 for respiratory devices that excluded the Recalled Devices, and Respironics would complete a

full remediation of the Recalled Devices that DHS had purchased and had in its possession. During this time, PMC continued to indicate that DHS' payment obligations to PMC were deferred pending final resolution.

77. On August 18, 2022, PMC abruptly informed DHS that it was in default under Leases 41-50, despite the ongoing negotiations and PMC's prior representations that payment obligations were deferred. On or around that date, PMC and Respironics shared commercially and competitively sensitive information about DHS with DLL and ResMed, respectively. Specifically, PMC and Respironics disclosed to DLL: (i) that PMC had declared DHS in default; (ii) the amounts DHS allegedly owed under the MLA and Leases 41-50; (iii) DHS's payment history and credit profile; and (iv) that PMC intended to refuse further financing to DHS until the alleged default was cured. This information was communicated through Mr. Schade and other representatives of Respironics and PMC to DLL personnel responsible for HOP's financing relationship.

78. Respironics, although ostensibly in a different level of the supply chain as a Respiratory Device Manufacturer, facilitated DHS' and PMC's restructure negotiations for Leases 41-50 on behalf of both PMC and Respironics. Respironics' own employee, Mr. Schade, was then one of the individuals involved in the information exchange to DLL. Respironics' participation in the information sharing demonstrates Respironics' role as a horizontal competitor standing in the shoes of PMC and acting in concert with PMC and DLL. The coordinated nature of the conspiracy is further evidenced by the fact that DLL took adverse action against HOP—a separate legal entity with an unblemished payment record with DLL—within five days of PMC's declaration of default against DHS, an outcome that would not have occurred absent advance coordination among the conspirators.

79. For example, on August 23, 2022—just five days after PMC declared DHS in default under the MLA and Leases 41-50—DLL, without notice, placed HOP on a finance hold and told HOP that it would refuse to finance HOP's pending and future respiratory device purchases with ResMed.

80. On that same day, August 23, 2022, ResMed also placed HOP on a hold from purchasing respiratory devices from ResMed because DLL froze HOP's financing.

81. At all materially relevant times up to and including August 23, 2022, HOP had complied with all of its Respiratory Device Financing arrangements with DLL related to the purchase of ResMed respiratory devices. HOP had never missed a payment, had no outstanding defaults, and had maintained a positive credit relationship with DLL. HOP's financing relationship with DLL was entirely separate from DHS's financing relationship with PMC, involving different equipment (ResMed devices rather than Respironics devices), different contractual agreements, and different legal entities. There was no legitimate business reason for DLL to freeze HOP's financing based on a dispute between DHS and PMC.

82. On August 23, 2022, Plaintiffs reached out to ResMed to inquire about the financing hold and purchasing prohibition.

83. On August 24, 2022, HOP signed a new lease with DLL, which HOP believed would remove the finance freeze from its account.

84. On August 25, 2022, DLL informed HOP that it would approve the new DLL lease, but that DLL would not provide Respiratory Device Financing to HOP for any additional leases because of PMC's declaration of default against DHS. DLL's actions were taken in concert with PMC and Respironics to force DHS into restructuring its lease agreements with PMC on terms beneficial to Defendants.

85. On August 30, 2022, based on information it learned from Defendants, ResMed informed Plaintiffs that DLL would refuse to finance respiratory devices purchases by Plaintiffs and that ResMed would place Plaintiffs on hold for all current and future respiratory device purchases. Due to the recall affecting Respironics' respiratory devices, ResMed had the lead position in the Respiratory Device Manufacturer market, and DLL leveraged that dominance to punish Plaintiffs.

86. Specifically, ResMed has two exclusive financing partners, DLL and Wells Fargo. Once a Respiratory Device Supplier is assigned to one of these exclusive financing partners, the Respiratory Device Supplier is prohibited from obtaining financing from the other. This structure creates a market in which Respiratory Device Suppliers must abide by the terms imposed by their assigned financing partner, regardless of the financier's conduct, because it is not economically feasible to remain competitive without access to the preferred financing terms offered by these partners. As a result, Respiratory Device Suppliers that are foreclosed from financing with an exclusive partner must pay significantly higher interest rates on equipment, and those increased costs are passed on to consumers. Consumers therefore have fewer options for lower-priced, necessary breathing devices when a Respiratory Device Supplier is cut off from an exclusive financing partner.

87. This dynamic was even more pronounced at the time of the Respironics Recall, when Respiratory Device Suppliers were forced to rely almost entirely on ResMed.

88. Upon information and belief, many Respiratory Device Suppliers that financed breathing device purchases from both Respironics and ResMed at the time of the Respironics Recall had no meaningful choice but to comply with PMC's and DLL's repayment demands or risk having their businesses significantly harmed. That some Respiratory Device Suppliers may

have complied with PMC's and DLL's terms does not negate that Defendants created a market in which Respiratory Device Suppliers lack any practical recourse, enabling Defendants to unilaterally set prices and control which Respiratory Device Suppliers remain competitive.

89. DLL's communications with Plaintiffs expressly show that PMC and Respironics were sharing commercially and competitively sensitive information with their competitors and leveraging their dominant positions in the Respiratory Device Financing market and Respiratory Device Manufacturing market, respectively, to force DHS into unfavorable payment and finance terms with PMC regarding the Recalled Devices.

90. Rather than continue to negotiate with DHS in good faith regarding remediation for the Recalled Devices, Defendants engaged in concerted conduct to foreclose Plaintiffs from being able to purchase respiratory devices in the U.S. by sharing commercially sensitive information and leveraging their dominance in the Respiratory Device Manufacturing market and the market for Respiratory Device Financing, respectively.

91. In a concerted effort to force Plaintiffs to make supracompetitive payments to PMC for Recalled Devices, Defendants conspired to refuse to deal with Plaintiffs and to foreclose Plaintiffs from Respiratory Device Financing and being able to purchase respiratory devices manufactured in the U.S.

92. Competitors exchanging customer information is a well-recognized form of anticompetitive conduct. In a but-for competitive market, Plaintiffs and similarly situated suppliers would have reasonable protections in place that prohibit horizontal competitors from sharing confidential financial information to foreclose Respiratory Device Suppliers from obtaining financing at competitive rates.

93. Upon information and belief, PMC's and Respironics' actions in sharing commercially and competitively sensitive information with their competitors were taken with knowledge that DLL would further this scheme by taking immediate action against DHS's wholly-owned affiliate, HOP. Indeed, although PMC operates independently and separate and apart from DLL, DLL's financial and ownership interest in PMC creates an environment where DLL is able to leverage its dominant position in the Respiratory Device Financing market to force Respiratory Device Suppliers to make supracompetitive payments—*e.g.*, Respiratory Device Suppliers being forced into unfavorable payment and finance terms with PMC regarding the Recalled Devices.

**F. Antitrust Injury**

94. The information that was shared was material and competitively sensitive and thus facilitated exclusionary, anticompetitive conduct. Defendants engaged in this conduct with the intent of leveraging their dominant market position to increase prices for Respiratory Device Suppliers and ultimately OSA patients.

95. The harm to the Respiratory Device Suppliers market flows directly from Defendants' agreement and the sharing of Respiratory Device Suppliers' material and competitively sensitive information.

96. Defendants' actions served to prevent Plaintiffs from competing in the Respiratory Device Supplier market.

97. This coercive structure also eliminates meaningful competition among financing providers because DLL has obtained exclusivity over financing from the largest Respiratory Device Manufacturers and uses that dominant control to dictate which Respiratory Device Suppliers will remain competitive.

98. As a result of Defendants' conduct Plaintiffs paid increased financing rates, reflecting the broader increase in prices across the market caused by Defendants' foreclosure of preferred financing channels.

99. The injury to Plaintiffs was a foreseeable consequence of Defendants' refusal to deal with Plaintiffs, which was done with the intent to obtain payments from Plaintiffs for breathing devices that were subject to an FDA Class recall.

100. As a direct and proximate result of this anticompetitive scheme, Respiratory Device Suppliers (including Plaintiffs) were forced to pay supracompetitive interest rates for Respiratory Device Financing and supracompetitive prices for respiratory devices manufactured in the U.S. These increased costs were passed through to OSA patients and their insurance payors in the form of higher prices for respiratory devices. In addition, OSA patients' access to safe and effective respiratory devices was foreclosed, as a result of reduced output in the Respiratory Device Supplier market. While patients waited for safe and effective respiratory devices, the health risks associated with their OSA were exacerbated.

101. Plaintiffs' injuries are representative of the harm imposed on similarly situated market participants, and Defendants' concerted conduct applies uniformly across the Respiratory Device Supplier market, ultimately harming OSA patients.

102. The injury to Plaintiffs and to consumers is of the type that antitrust laws are intended to prevent. Among other things, Defendants' dominant control over the availability of 0% financing effectively sets costs for OSA patients.

103. For example, Defendants' concerted actions, including sharing of commercially and competitively sensitive information between competitors and leveraging their respective

dominant market positions, caused significant harm to Respiratory Device Suppliers and to OSA patients that could not access safe and effective respiratory devices to treat their OSA.

104. The economic logic of Defendants' concerted actions implies broader harm across the applicable market and has injured OSA patients by forcing Respiratory Device Suppliers to either comply with the harmful demands of Respiratory Device Manufacturers and Respiratory Device Financiers or cease being competitive in the Respiratory Device Supplier market.

105. Plaintiffs have alleged observable market injuries consistent with the type that antitrust laws are intended to prevent, including, but not limited to: (1) higher prices for both Respiratory Device Suppliers and OSA patients; (2) reduced output by limiting which Respiratory Device Suppliers can maintain competitive standing; (3) fewer choices among Respiratory Device Suppliers; and (4) deterred entry into the market due to Respiratory Device Financiers' exclusivity agreements with dominant Respiratory Device Manufacturers.

106. Defendants' exclusivity and foreclosure scheme not only caused Plaintiffs to incur supracompetitive financing costs, but—by design—applies uniformly to similarly situated Respiratory Device Suppliers, restricting access to preferred financing partners, raising costs across the market, and thereby suppressing competition in Respiratory Device Financing.

107. Plaintiffs are representative of the Respiratory Device Supplier market and the harm alleged evidences how Respiratory Device Suppliers as a whole are competitively harmed by Defendants' concerted refusal and business practices because the ability to compete as a seller in the Respiratory Device Supplier Market is significantly foreclosed by Defendants' agreement, which is precisely the type of injury the antitrust laws exist to prevent.

108. Defendants' concerted refusal to deal with Plaintiffs is facially anticompetitive because it served no procompetitive benefit and only harmed competition for the supply of

respiratory devices, resulting in reduced access to respiratory devices for OSA patients, supracompetitive prices and higher interest rates for respiratory devices in the U.S., and diminished output in the Respiratory Device Supplier Market.

109. These types of group boycotts fall within the class of restraints that are inherently unduly restrictive and that the antitrust laws are intended to prohibit. The *per se* rule applies to concerted efforts by one or more firms to disadvantage competitors by directly denying—or by persuading or coercing suppliers or customers to deny—relationships necessary for those competitors to compete.

110. Even if the Defendants' concerted refusal to deal and sharing of competitively sensitive information does not amount to a *per se* violation, it constitutes a violation of Sherman Act Section 1 pursuant to a quick look analysis or a full-blown rule of reason analysis because Defendants' conspiracy has no rational business justification.

111. Indeed, a group boycott among horizontal competitors—facilitated through the exchange of customers' competitively sensitive information and resulting in the foreclosure of competition and harm to end-user patients—is precisely the type of conduct that threatens competition and consumer welfare. Practices such as group boycotts that both foreclose suppliers' ability to compete and increase prices for necessary medical devices are inherently anticompetitive.

## COUNT 1

**Unlawful Agreements in Restraint of Trade under Sherman Act Section 1**
**15 U.S.C. § 1**
**(Defendants' Concerted Refusal to Deal and Monopoly Leveraging)**

112. Plaintiffs incorporate by reference all of their previous allegations as if fully set forth herein.

113. PMC, Respironics, and DLL unlawfully conspired to restrain trade by agreeing that PMC and DLL would not enter into any Respiratory Device Financing with DHS or HOP.

114. HOP and DHS had fulfilled their obligations to ResMed and DLL prior to PMC and Respironics sharing commercially sensitive information with DLL and ResMed for the sole purpose of forcing DHS into an unfavorable resolution of its dispute with PMC regarding Recalled Devices. There was no business justification for DLL to refuse to deal with DHS or HOP.

115. PMC's, Respironics's, and DLL's actions constitute a *per se* refusal to deal with DHS, HOP, and other Respiratory Device Suppliers impacted by Recalled Devices.

116. PMC's, Respironics's, and DLL's concerted actions have no rational business justification and are designed solely to injure DHS's and HOP's ability to compete and supply OSA patients by cutting off or curtailing their supplies and financing for respiratory devices and forcing OSA patients to forego life-saving respiratory devices or to pay supracompetitive prices for respiratory devices.

117. As a result of PMC's, Respironics's, and DLL's conspiracy to refuse to deal with DHS and HOP, DHS and HOP have been (i) foreclosed from Respiratory Device Financing or forced to pay materially higher financing rates for their purchases of respiratory devices with Respiratory Device Financiers in the U.S., resulting in increased costs that were passed on to OSA patients and their insurers, (ii) coerced into paying full price for respiratory devices subject to a Class I FDA recall that Respironics itself rendered worthless and (iii) unable to adequately supply respiratory devices to their patients thereby reducing output in the Respiratory Device Supplier Market, and (iv) deprived of the ability to compete on the merits with other Respiratory Device Suppliers.

118. As a result of PMC's, Respironics's, and DLL's anticompetitive conduct, DHS and HOP have been damaged in an amount to be determined at trial, which amount shall be trebled pursuant to 15 U.S.C. § 15, and shall include costs of the action. Damages include, but are not limited to: (i) the difference between the zero-percent financing rates Respiratory device Suppliers would have received absent the conspiracy and the higher market rates Respiratory device Suppliers are forced to pay after being denied access to preferred financing, multiplied by the volume of respiratory devices Respiratory device Suppliers would have financed during the relevant period; (ii) Respiratory device Suppliers' lost profits from sales of respiratory devices they were unable to make due to being cut off from financing and supply; and (iii) Respiratory device Suppliers' diminished business value and customer relationships. Absent Defendants' conspiracy, Plaintiffs would have continued to obtain Respiratory Device Financing at competitive, zero-percent interest rates, would have maintained their competitive standing in the Respiratory Device Supplier Market, and would have been able to supply safe and effective respiratory devices to OSA patients at competitive prices. The injuries suffered by Plaintiffs—supracompetitive financing costs, lost sales, and competitive foreclosure—are precisely the type of injuries the antitrust laws were designed to prevent.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Respironics, DLL, and PMC as to Count I, including:

a. A judgment finding that DLL's, Respironics's, and PMC's agreement in restraint of trade violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

b. A judgment awarding DHS and HOP all appropriate damages in an amount to be determined at trial including, but not limited to, treble damages, punitive damages, and costs and fees, including attorneys' fees, as permitted by law;

c. A judgment awarding DHS and HOP prejudgment and post-judgment interest, as permitted by law; and

d. Such other legal, equitable, or further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs Dynamic Healthcare Services, Inc. and Hometown Oxygen, Pittsburgh LLC demand a trial by jury of twelve (12) jurors.

Dated: April 2, 2026

**DUANE MORRIS LLP**

By: */s/ Bryan N. Shapiro*

Bryan N. Shapiro (329241)
Sarah O'Laughlin Kulik (318534)
30 South 17th Street
Philadelphia, PA 19103-4196
T: (215) 979-1000
e: Sckulik@duanemorris.com
BShapiro@duanemorris.com

C. Neil Gray (*pro hac vice*)
Duane Morris LLP
335 Madison Avenue
New York, NY 10017
T: (212) 692-1000
e: CNGray@duanemorris.com

*Attorneys for Plaintiffs Dynamic Healthcare Services, Inc. and Hometown Oxygen, Pittsburgh LLC*